## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| **Webb Candy, Inc. and Licensed Sports Marketing, LLC,** | **Case No.: 09-CV-02056-PJS-JJK** |
| **Plaintiffs,** | **Case Type: Civil** |
| **v.** | |
| **Walmart Stores, Inc.,** | **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **Defendant.** | |

_____

### INTRODUCTION

Defendant's motion for summary judgment must be denied. The motion seeks the remedy of recission based on allegations of fraud and misrepresentation, but the facts show that Walmart knew of any alleged "fraud" and ratified the "fraud" by accepting the benefits of the relationship. Moreover, there was no misrepresentation or fraud on the part of Plaintiffs that would allow for recission.

### FACTS[1]

Defendant's motion for summary judgment contains a lengthy "Statement of Facts," many of which are not supported by the record and are misleading and incomplete. Walmart attempts to paint a picture of being duped by Webb Candy through concealments of Webb Candy's involvement in the sales of the product, but there is

_____

[1] Plaintiffs also moved this Court for summary judgment on February 9, 2011. Plaintiffs' Memorandum in support of that motion contains additional facts that are incorporated herein.

ample evidence that Walmart knew they were dealing with Webb Candy when they ordered, accepted, and sold the products at issue here.

     1.   <u>Authorization to Sell to Walmart</u>.

Walmart states that there are only two ways for a product to be sold through a Walmart retail store; the National Supplier Program and Local Purchase Program. (Walmart Memo p. 2, ECF No. 37). This statement is not accurate because the individual Walmart store managers are authorized to purchase products directly from vendors.

Walmart's corporate fraud researcher testified that store managers are authorized to purchase product and that orders placed by the managers are considered "authorized." (Ludwick depo. 17:19-24; 38:1-7; 46:24-47:2; Aff. of SM Exh. 9).[2] Walmart's senior buyer of impulse merchandising, Seth Malley, also testified that store managers are authorized to buy products and that if the store manager ordered the product and there's a purchase order then it's an authorized order.[3]

The store managers can purchase product through a procedure called "70-typing." Walmart fails to mention this procedure in its memorandum. As described by store managers to Webb Candy employees, "70-typing" is used for purchases at the store level

---

[2] All deposition testimony and exhibits cited are attached to the Affidavit of Steven Moore ("Aff. of SM").

[3] Walmart claims that Plaintiffs have been "unable to provide testing records to show that its products are safe for human use." (Walmart Memo p. 2). The product was tested and the results were available to Walmart; however Walmart never asked for them. (Aff. of Alan Webb). The safety of the products only became an issue after litigation began in an effort to avoid payment for the product. Walmart testified that the <u>only</u> reason it pulled the product from the shelves in March 2009 was because the purchases were not authorized by the buyer at the home office. Safety was never an issue. (Carter depo. 59:4-13; Aff. of SM Exh. 3).

for items of local interest such as souvenirs and school imprint items. (Esterley depo. 9:11-11:8; 12:14-14:2; Aff. of SM Exh. 7). The procedure allows the individual Walmart stores to order directly from a seller such as Plaintiffs without involving Walmart's corporate office. (Also see Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, ECF Document 40, Statement of Facts, pages 2-8).

On three separate occasions, Webb Candy had direct communication with Walmart as to how it could bring its products into Walmart, and was repeatedly told that its products were local items that would not go through Walmart's corporate office, but had to be purchased at the store level.

Webb Candy's first communication was with the store manager of the Apple Valley, Minnesota store in September of 2008. (Webb depo. 57:6-59:1; 104:18-20; Aff. of SM Exh. 4). Webb Candy was told by Luke, the store manager, that the individual stores could "70-type" the order, thereby ordering directly from the seller instead of the sale being made through Walmart's corporate office in Arkansas. (Webb depo. 105:21-106:23; Aff. of SM Exh. 4; Esterley depo. 22:5-12; Aff. of SM Exh. 7).

Shortly thereafter, Paul Henson, Webb Candy's Sales Manager, inquired as to how to bring the products in "through corporate" and was told by Seth Malley, the buyer at the corporate office, "Logistically, that product wouldn't be able to go through our distribution center. It's a regional item. It's something that can't be broken apart and distributed." (Henson depo. 42:21-25; Aff. of SM Exh. 5).

Webb Candy reached out to Walmart a third time, and Seth Malley again told Webb Candy that local high school items are purchased on a local level and are not done

through corporate and there was not anything special they had to do at the corporate level. (Henson depo. Exh. 19; 51:19-54:8; Aff. of SM Exh. 5). [4]

Walmart cannot in good faith seriously assert at this point that Webb Candy bypassed normal purchasing procedures.  The normal purchasing procedure for local high school items was for the individual stores to order the product.  The 70-type procedure is routinely used by individual Walmart stores to purchase items of local interest.  Walmart University's publication on how to use the "70-type/Local Item File" clearly states that the purpose of the 70-type/Local Item File is for "items added at store level."  The publication states:

"The only items that belong in the local item file are local purchase items and visual-verifying numbers.  Local purchase consist of items such as

- Souvenirs

- School Imprint Items (e.g. shirts, hats)"

(Carter depo. Exh. 1; Bates No.: WAL000006; emphasis added; Aff. of SM Exh. 3).

---

[4] Paul Henson is a former employee of Webb Candy who admittedly does not like the CEO of Webb Candy, Alan Webb.  Mr. Henson testified in response to Walmart's questioning, "…Quite honestly, you know, I personally don't like the man that you're suing, All right.  And typically, you would think that I would be a great witness for Walmart. But I do remember these things happening, and I remember being confused as to why this was happening.  Because I did have a meeting with the store manager who had specifically said that, 'If it's going to be a regional product and be sold regionally, this is how you need to sell it.'"  (Henson depo. 48:24-49:12; Aff. of SM Exh. 5).  When asked if it was *obvious* that Webb Candy should not have used another company's vendor number he testified as follows: "You know, listen, like I said, I'd love to be able to help you win over a man [Alan Webb] who I really personally don't care for, but the reality is, these store managers bought the product…If a store manager says, 'I'm authorized to do this and here's a purchase order,' and you've got somebody from corporate saying that that's handled on a local or regional level, it's not obvious." (Id. at 62:24-63:15).

The lip balm and hand sanitizer products at issue in this case are school imprint items and are clearly covered by the "70-type" procedure for purchasing such items.

A purchase by a store manager is an authorized purchase according to Walmart's own guidelines and the testimony of Walmart. All of the purchases at issue in this case were by store managers, and all were therefore authorized.

2. <u>Supplier Application Process.</u>

Walmart devotes a substantial portion of its statement of facts to address its application process and procedure for obtaining a supplier identification number or a "vendor number." The application process, however, is not an issue in this case, but even if it were, Walmart's rendition of the facts is inaccurate and needs to be corrected in certain material respects because Walmart uses the inaccuracies to imply Webb Candy was serendipitously trying to circumvent known Walmart buying procedures.

Walmart states in its memorandum that in 2006 Webb Candy made several unsuccessful applications through Walmart's online product submissions process to become an authorized supplier of <u>lip balm</u>. (Walmart Memo p. 5, ECF No. 37). Webb Candy did submit two applications in 2006, but it was to become a supplier for its <u>candy products</u>, not the lip balm. (Webb depo. 41:1-10; Aff. of SM Exh. 4). (Even if Walmart's facts were accurate, its own rejection letter invites multiple applications. <u>See</u> footnote 5, *infra* p. 6.

Mr. Webb completed another application in November 2008 for lip balm and hand sanitizer, but testified that he understood that application process was to sell product to

Walmart at a "corporate level" (through the National Supplier Program). (Id. at 47:16-25).

Webb Candy did not seek to circumvent Walmart's supplier approval process. Webb Candy already was selling to the individual Walmart Stores using the 70-type purchase program *before* its application was submitted in November 2008. (Carter Depo. Exh. 3; Aff. of SM Exh. 3). Webb Candy's application in 2008 was rejected to become a supplier for the National Supplier Program, but this had nothing to do with the "70-type" sales. Walmart had repeatedly told Webb Candy that the local high school product had to be purchased at the local store level, and the local stores continued ordering product through February 2009. (Henson depo. 42:21-25; 51:19-52:21; Aff. of SM Exh. 5).[5]

3.    Webb Candy Clearly Identified Itself to Walmart.

Walmart also states in its memorandum that "Webb Candy's employees would pose as employees of Little i." (Walmart Memo p. 7, ECF No. 37). Walmart's statement is inaccurate and is contradicted by the facts. When Webb Candy employees contacted the stores, they identified themselves as being "with" Little i or Licensed Sports Marketing, (Jacobs-Pozzani depo. 10:20-24; Aff. of SM Exh. 8; Henson depo. 32:19-33:19; Aff. of SM Exh. 5); but being associated "with" a company is very different than "posing as an employee." Although being "with" a company may be ambiguous as to

_____

[5] Walmart does not limit the number of products a supplier can submit. The website does not block a vendor who has been rejected from submitting even the same product. (Carter depo. 46:16-47:6; Aff. of SM Exh. 3). Walmart's rejection email does not even list the product submitted and states, "Please do not hesitate to submit any other product that you would like to introduce to Walmart or Sam's" (Carter depo. Exh. 3; Aff. of SM Exh. 3).

what the relationship was, Alan Webb had unambiguously explained in writing in an email to Walmart what the exact relationship was between Little i and Webb Candy. *See infra* p. 17. The two companies were jointly involved in the sales to Walmart so the statements were in fact accurate. The reason Walmart cites these statements is presumably to show it didn't know who was supplying the product. Nothing could be further from the truth. Walmart had actual notice Webb Candy was supplying the goods from at least eleven facts:

a.    Alan Webb was personally present at an initial meeting with the manager of the Apple Valley Walmart store where he told the store manager that <u>Webb Candy</u> wanted to sell to Walmart. (Webb depo. 18:2-16; 58:1-59:1; Aff. of SM Exh. 4).

b.    Richard Twistol, an employee of Webb Candy, testified that he initially introduced himself as being "with Webb." (Twistol depo. 26:11-16; 47:11-18; Aff. of SM Exh. 10).

c.    Alan Webb had the Apple Valley Walmart store manager review the invoice before they started selling to Walmart in conjunction with Little i in the Fall of 2008. The invoice contained Little i's name. (Webb depo. 56:21-59:7; Aff. of SM Exh. 4);

d.    Webb Candy answers its phones as "Webb Candy"; (Esterley depo. 21:22-25; Aff. of SM Exh. 7; Webb depo. 32:24-33:13; Aff. of SM Exh. 4). Reorders were by telephone to Webb Candy from the stores;

e.    The lip balm that Walmart purchased was labeled "Distributed by Webb Candy" and included Webb Candy's website.[6] (Aff. of Alan Webb, Exh. 2, ECF Document 41-2, filed with Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment);

f.    The first invoice dated October 15, 2008 and all subsequent invoices sent to Walmart state "<u>Webb Candy</u> accepts Visa and Mastercard." (Emphasis added)(Aff. of Alan Webb dated March 2, 2011, Exh. 2; Aff. of Alan Webb, Exh. 3, ECF Document 41-3, filed with Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment);

g.    The UPC code on the lip balm Webb Candy sold to Walmart scans as "Webb Business Promotions" (Aff. of Alan Webb, dated March 2, 2011, ¶9).[7] Every time the product sold it would show Webb as the supplier;

---

[6] Not surprisingly, a random Walmart customer was able to figure out that Webb Candy was the supplier of the lip balm from the product label itself and directly contacted Webb Candy to find out if Webb Candy would be interested in making customized lip balm for his business. (Aff. of Alan Webb; also see footnote 11, <u>infra</u> p.13). If a customer of Walmart could identify the supplier from the label, certainly Walmart could.

[7] Walmart claims that without the product UPC numbers, Walmart's home office was unable to "learn the scope of Webb Candy's action." (Walmart Memo p. 11). Seth Malley, Walmart's employee, testified "Well, he [Alan Webb] just gave us the numbers [UPC numbers] so we could start trying to track it. So when you use 70-type things on this large of a scale, it makes it really complex to know what you have, because different stores are using different item descriptions…" (Malley depo. 37:5-10; Aff. of SM Exh. 2). However, Walmart's accounting department apparently knew what was happening

h.     The Walmart store displays that hold the lip balm include Webb Candy's telephone number for reorders. (Webb depo. 32:13-21; Aff. of SM Exh. 4).

i.     The Apple Valley Walmart reordered product directly from Webb Candy using both Little i's vendor number and then LSM's vendor number after Webb Candy entered into the joint venture with LSM. Again, when the stores placed the reorder, the phone was answered "Webb Candy." (Webb depo. 32:24-33:13; 84:24-85:2; Aff. of SM Exh. 4).

j.     Walmart issued a check directly to Webb Candy on one occasion for a shipment of product. (Webb depo. 85:18-86:24; Aff. of SM Exh. 4; Aff. of Alan Webb dated March 2, 2011, Exhs 3 and 4).

k.     And most importantly, Webb Candy told Walmart on November 4, 2008 that "Isaac from Little i and I have been working on a project together…marketing to the Walmart stores directly." (Malley depo. Exh. 6; Aff. of SM Exh. 2).

---

because it started paying on invoices beginning in November 2008, and continued paying a total of $923,912.77 through March 11, 2009. (Webb depo. Exhs. 23 and 25, Aff. of SM Exh. 4). Walmart's position appears to be that within Walmart the right hand didn't let the left hand know what it was doing, so now the Plaintiffs should suffer a tremendous economic loss. Walmart had Webb Candy's products in their stores with Webb Candy's name on the label and Webb's UPC numbers since October 2008, and was paying for them and accepting the benefit. (Rautio depo. Exh. 41, Bates No.: 102835; Aff. of SM Exh. 6).

Walmart clearly had actual notice of Webb Candy's involvement and can not reasonably claim it was deceived.

4.    There is No Evidence of Fraud or Misrepresentation.

Walmart also claims that because the invoices were in the name of Little i and LSM, it did not know of Webb Candy's involvement.  These statements ignore additional clear evidence to the contrary.

When Webb Candy started selling to the individual Walmart store in Apple Valley, Minnesota in approximately October 2008 it met with the store manager. (Webb depo. 56:4-15; 57:6-18; 105:1-3; Aff. of SM Exh. 4).  Alan Webb told the store manager that Webb Candy would be "working together with Little i on this project."  The store manager reviewed the invoice with Little i's name on it before the first order was placed and gave Webb Candy the go-ahead.  (Webb depo. 56:21-59:7; Aff. of SM Exh. 4). Webb Candy then started calling on other individual Walmart stores throughout the country in the same manner.  (Esterley depo. 9:10-14:3; Aff. of SM Exh. 7; Webb depo. 17:25-18:16; Aff. of SM Exh. 4).

Walmart's corporate office employees had clearly identified Webb Candy as the supplier of the products as early as November 2008.  Walmart's fraud investigator, Angela Ludwick, started an investigation of Webb Candy's products sold to the individual Walmart stores in November of 2008, after receiving three phone calls from stores regarding the lip balm. (Ludwick 20:16-20; 21:20-24; Aff. of SM Exh. 9).[8]  As

_____

[8] Walmart implies in its statement of facts that numerous complaints were made by the individual stores. (Walmart Memo p. 10).  In reality, only three stores called the

early as December 17, 2008, Ms. Ludwick had directly contacted Webb Candy by sending an email to Paul Henson. (Henson Exh. 19; Aff. of SM Exh. 5).

Kim Carter, Walmart's manager of supplier development, also knew Webb Candy was working with Little i. She testified that she knew in November 2008 that Webb Candy was not a vendor of record. Upon prompting from Defendant's counsel, Ms. Carter changed her testimony to December 2009, but in any event it was well before Walmart stopped purchasing the product that Walmart knew of Webb Candy's involvement. (Carter depo. 52:17-24; Aff. of SM Exh. 3).

Walmart's own internal documents also show that Walmart ran a Dun and Bradstreet Comprehensive Report on Webb Business Promotions, Inc. on December 22, 2008 (Bates No.: WAL000147-162; Aff. of SM Exh. 1).

In late November or early December 2008, Webb Candy had ceased doing business with Little i and began a similar relationship with LSM and Alan Webb notified Walmart that it was working with LSM. (Webb depo. 68:13- 69:7; 72:4-14; Aff. of SM Exh. 4; Malley Exh. 8; Aff. of SM Exh. 2).[9] Larry Wilhelm, the former owner of LSM, also notified Walmart it was working with Webb Candy. He told Walmart that a lockbox

corporate office to complain. (Ludwick 20:16-20; 21:20-24; Aff. of SM Exh. 9). To put that in perspective, Plaintiffs sold product to over 900 individual stores. (Carter depo. 60:6-11; Aff. of SM Exh. 3).

[9] Walmart states, "By January 2009, Webb Candy was still leading Walmart's fraud investigator to believe that Webb Candy was 'also known as Little i.'" This statement is blatantly wrong. The document cited is an email between Walmart employees. Webb Candy was not a party to this email and did not lead anyone to believe it was "also known as Little i." Walmart's own fraud investigator had direct contact with Webb Candy (not Little i) as early as December 17, 2009. (Henson Exh. 19; Aff. of SM Exh. 5).

had been set up for Walmart to direct payments. He testified the notification was done via email to the accounts payable department and probably to the buyer as well. (Wilhelm depo. 25:25-26:13; Aff. of SM Exh. 12).

Most damaging to Walmart's claim that it did not know of Webb Candy's involvement is the November 4, 2008 email from Alan Webb to Seth Malley telling Walmart exactly what it was doing. (Malley depo. Exh. 6; Aff. of SM Exh. 2).

5.    <u>Webb Agrees to Issue a Return Authorization.</u>

Although Webb Candy felt it had not done anything wrong in selling directly to the stores, it nonetheless issued a Return Authorization for products without purchase order numbers. (Webb depo. 92:12-16; 97:4-11; 113:3-12; Aff. of SM Exh. 4). On February 9, 2009 the Return Authorization was communicated to the individual Walmart stores. The Walmart buyer, Seth Malley, sent an announcement to the individual stores saying they could return the product to Webb Candy "<u>if you would like to</u>", but that all returns had to occur by February 28, 2009. (Malley depo. Exh. 10; 49:9-50:23, 64:13-65:5; Aff. of SM Exh. 2). Mr. Malley gave the individual stores the option to decide if they wanted to return the products during that time period; many of them did not, and some continued calling Plaintiffs asking to order more product.[10] (Webb depo. 85:18-86:12; Aff. of SM Exh. 4).

Seth Malley did not issue a "pull order" of the goods until sometime after March 18, 2009. (Malley depo. Exh. 15; 52:23-53:8; 72:1-74:21; Aff. of SM Exh. 2). When Ms.

---

[10] Mr. Malley testified, "so with Webb Candy, if I had store managers saying, you know, hey, we want your product, then we—we needed to respect that." (Malley depo. 27:5-9; Aff. of SM Exh. 2).

Carter was asked why Walmart waited until March to pull the product when Walmart knew in November something was happening with Webb Candy, she testified that Walmart was "[t]rying to resolve the issue." (Carter depo. 39:1-4; Aff. of SM Exh. 3).[11]

6. <u>Walmart's Payments to Webb Candy</u>.

Walmart's memorandum at footnote number 3 regarding its payments to Webb Candy (Walmart Memo p. 13, ECF No. 37) is inaccurate. Plaintiffs sold, shipped and invoiced Walmart products totaling $1,822,941.32. (Plaintiffs' Answers to Defendant's Second Set of Interrogatories, Int. No.: 27, ECF 43-11, Aff. of SM, Exhibit 11 filed with Plaintiffs' Motion for Summary Judgment). The $202,078 for orders cancelled and not shipped to Walmart referenced in Walmart's footnote 3 was in addition to the $1,822,941.32 sold and shipped to Walmart, not a part of the $1,822,941.32.[12] Walmart subtracted this $202,078 from the $1,822,941.32, which is in error. The correct sales figures, using Walmart's numbers from its footnote number 3 are as follows:

---

[11] Even after Walmart issued the "pull and hold" directive in March 2009, some product remained in at least one retail store. Alan Webb received an email from a realtor who saw the lip balm for sale in the Dawsonville, Georgia Walmart and inquired if he could purchase some for his realtor business. The email is dated April 23, 2009. (Aff. of Alan Webb ¶3).

[12] Webb Candy's invoices are not created until the date of shipping. (Webb depo. 133:24-136:3; Aff. of SM Exh. 4).

| Total Sales of products ordered, shipped, and invoiced: | $1,822,941.32 |
|---|---|
| Less Amount Walmart has paid: | $923,912.77 |
| Less All Credit Memos: | $386,521.46 |
| Less Product in Walmart's Warehouses as a result of the pull order in March 2009: | $362,404.00 |
| Total Amount owed Plaintiffs by Walmart: | $150,103.09 |

In addition, Walmart's own document shows it still owes LSM $152,507.71 for products it ordered and resold but has not paid for. (Bates No.: WAL000327-336; Aff. of SM Exh. 11). From the figures above, it is clear that Walmart owes Plaintiffs at least $150,103.09 without counting the products it retained in its warehouse.[13] Therefore, by taking the value of the product in the warehouse that has not been paid for ($362,404.00) and adding to that amount the amount Walmart still owes LSM ($150,103.09)[14], the total amount owed by Walmart to Plaintiffs, using Walmart's figures, is $512,507.09 ($362,404.00+$150,103.09=$512,507.09).

## ARGUMENT

## I. BREACH OF CONTRACT

Walmart's position is that the contracts are voidable because Plaintiffs induced Walmart to enter into the agreements through fraudulent misrepresentations. Walmart,

---

[13] The product in Walmart's warehouses is virtually worthless to Plaintiffs because it was all special order products with local high school imprints on the labels. For Plaintiffs to remove those labels and resell the product is cost prohibitive. (Webb depo. 39:8-40:10; Aff. of SM Exh. 4).

[14] For purposes of this motion, Plaintiffs are using the lesser of the two figures that Walmart shows it owes.

however, cannot show that a misrepresentation was made and cannot show it is entitled to recission because it ratified any claimed fraud, and its motion should be denied.

A.    No Misrepresentation.

In order to void a contract induced by fraudulent misrepresentation, the party seeking to void the contract must prove a "material misrepresentation." Carpenter v. Vreeman, 409 N.W.2d 258, 260-261 (Minn. App. 1987).

Walmart claims that when "Webb Candy instructed its sales staff to identify themselves as being with Little i or Licensed Sports Marketing," (Walmart Memo. p. 16, ECF No. 37), Webb Candy committed a material misrepresentation entitling Walmart to void the contract.

"An individual makes a misrepresentation by either making 'an affirmative statement that is itself false' or 'by concealing or not disclosing certain facts that render the facts disclosed misleading.'" Gully v. Gully, 599 N.W.2d 814, 821 (Minn. 1999). When the Webb Candy employees called the Walmart stores and identified themselves as being with Little i or LSM, that statement was not itself false, but it may have been ambiguous. Webb Candy was with Little i and later LSM in the sense that they were involved in a joint effort to sell product to Walmart. (Aff. of Alan Webb). It is not a false statement when a company is collaborating with another company for an employee of one company to say they are "with" the other company. That was the fact here – Webb Candy was working with Little i and later LSM to sell product to Walmart.[15]  Moreover,

_____

[15]  Walmart argues that one of Webb Candy's sales people, Mr. DeMarais, used a "hotmail" email account on an email with a Walmart store dated February 6, 2009,

Webb Candy's actual relationship was clearly explained to Walmart's corporate office. Plaintiffs did disclose facts that rendered the statements made not misleading.

Walmart devotes much of its argument trying to claim that Webb Candy tried to "hide the fact that the sales were actually made by Webb Candy." (Walmart Memo., p. 16, ECF No. 37). If Webb Candy was trying to hide its involvement, it would not have sent an email to Walmart explaining exactly what the facts were; it would not have its name appear on every sale and every label; it would not have its telephone number appear as the reorder recipient; and it would not have done any of the things mentioned in paragraphs a-k at *supra* pp.7-9.

Webb Candy never tried to hide anything. When Webb Candy initially met with the Apple Valley, Minnesota store manager, Webb Candy made it perfectly clear who it was. The Apple Valley store manager told Webb Candy he could buy the product but explained Webb Candy needed a vendor number. (Webb depo. 57:6- 59:7; Aff. of SM Exh. 4). When Webb Candy came back to that store manager with the Little i vendor number, it was the same Webb Candy people who first met the Apple Valley store manager and who now told him they were working with Little i and selling through Little i. (Id. at 58:1-59:7). After Webb Candy ended its relationship with Little i and started

implying this was intentionally deceptive. However, Alan Webb's email to Seth Malley in November 2008 used a Webb Candy email address (Malley depo Exh. 6; Aff. of SM Exh. 2), and Paul Henson also used a Webb Candy email address in his email to Walmart on December 17, 2008. (Henson depo. Exh. 19; Aff. of SM Exh. 5). In addition, Richard Twistol, one of the salespeople who sold to Walmart, testified that when he sent an email it would show up as Webb Candy. (Twistol depo. 22:1-12; Aff. of SM Exh. 10). Mr. DeMarais' use of the "hotmail" email address was an isolated incident that occurred well after Walmart knew of Webb Candy's involvement and shows just how desperate Walmart is to come up with facts to support its argument.

selling through LSM, the same Webb Candy people informed the Apple Valley manager of the change and the Apple Valley manager continued to order product.  (Id. at 84:24-85:17)

Webb Candy also told Walmart about its relationship with Little i.  On November 4, 2008 Alan Webb sent an email to Seth Malley stating how Webb Candy was selling to Walmart with Little i.  The email reads:

> Hello Seth:
>
> How are you?
>
> I would like to know if you can help me with something.  Isaac from Little i and I have been working on a project together that I presented to Isaac.  We have been marketing to the Walmart stores directly lip balms decorated with High School logos on them.  We are doing the manufacturing and the sales to each store and Isaac is helping us with the sales part of the organization.
> We are doing most of the work on this and I have discussed this with Isaac and he is in agreement to allow me to take over this program 100%.  This is where I need your help.  We need to obtain our own vendor number.  Will you help me with this.  We have already sold 1 million lip balms to Walmart stores and we are being told they are out selling the major brands.  I would really appreciate your help with this.  If you would like to discuss this please contact me at 612-386-3511.
>
> Also, we are excited about some new mint projects that we are putting together right now for you in a power point presentation and would like to meet with you in January.  We will send you the power point in the next few weeks.
>
> Thank you.
>
> Alan Webb
> Webb Candy
> www.webbcandy.com

(ECF 43-2, Aff. of Steve Moore, Exhibit 6 filed with Plaintiffs' Motion for Summary Judgment).

Walmart virtually ignores this all important email in its memorandum on page 6 other than to state that Mr. Malley "never responded to the email."

The email destroys Walmart's argument that Webb Candy induced Walmart into the contracts by fraudulent misrepresentation. In order to be a misrepresentation, the statement must be false. <u>Gully</u>, 599 N.W.2d at 821. Webb Candy expressly told Walmart in writing exactly what it was doing in selling through Little i, so there was no misrepresentation.

Although misrepresentation can occur by "concealing or not disclosing certain facts that render the facts disclosed misleading" <u>Id</u>., if Webb Candy intended to mislead Walmart, it never would have expressly told Walmart in writing of its relationship with Little i or LSM. <u>See</u> <u>M.H. v. Carita Family Services</u>, 488 N.W.2d 282, 289 (Minn. 1992) (if the intent was to mislead, the issue never would have been raised at all). Webb Candy was candid with the Walmart store manager and told him during the initial sales presentation of its relationship with Little i; and as early as November 4, 2008 in an email to Walmart's corporate office, Webb Candy told Walmart corporate of its relationship with Little i. There is nothing misleading about what Webb Candy told Walmart. It explained exactly what was occurring in its email of November 4, 2008. Walmart was fully informed of the facts.

In addition, Webb Candy had repeated conversations with Walmart's corporate investigators beginning in late November 2008 about how it was selling to Walmart.

(Ludwick depo. 21:20-24; Aff. of SM Exh. 9; Henson Exh. 19; Aff. of SM Exh. 5; *see*

*supra* pp. 10-11). Walmart knew how the sales were being made and who supplied the

product. The very label on the lip balm states "Distributed by Webb Candy." (ECF 41-2,

Aff. of Alan Webb, Exh. 2 filed with Plaintiffs' Motion for Summary Judgment). If there

was any ambiguity from anything Webb Candy said, it was cleared up by the

identification of the supplier on the label.[16] With full knowledge of the way in which

Webb Candy was selling to the stores, Walmart continued to purchase product and pay

for it until February 2009. (Malley depo. 71:21-25; Aff. of SM Exh. 2).

There is no misrepresentation supported by the evidence allowing Walmart to void

the sales. Walmart ordered the product and continued to do so with full knowledge that

Webb Candy was selling through Little i and later, LSM.

One of the elements of fraud is damages. Hay v. Dahle, 386 N.W.2d 808, 811

(Minn. App. 1986). But because Walmart has suffered no damages – in fact, the opposite

is true – its only available possible remedy is rescission if it can prove fraud. Kirby v.

Dean, 199 N.W. 174 (Minn. 1924). Rescission, however, must be complete; one cannot

"rescind in part and affirm in part." Fouquette v. First American National Securities,

Inc., 464 N.W.2d, 760, 763 (Minn. App. 1991). The rescission must be "*in toto*." Id.

In Fouquette, the plaintiff was an investor who entered into an agreement with one

of the defendants to purchase securities. Id. at 761. The plaintiff invested in two types of

investments and sought rescission of just one of the investments based on fraud. Id. He

did not seek a rescission as to the second investment, and the court held that rescission

---

[16] See also footnote 6, *supra* p. 8.

must be of the whole— a party claiming fraud cannot affirm in part and rescind in part. Id. at 763.

A party claiming fraud in the inducement has an election of remedies (assuming it can prove the fraud, which Walmart has failed to do). One remedy is that the party can "affirm, and keeping what he has received, sue at law for what damages he has sustained by reason of the fraud." Hatch v. Kulick, 1 N.W.2d 359, 360 (Minn. 1941). (Walmart has no damages, but in fact has received a significant benefit.)

Walmart admits that it paid Plaintiffs $923,912.77 for the products it ordered, which it in turn resold at retail to its customers at a profit. Walmart purchased the lip balm for $.63 per tube, and resold it to its customers at retail for $1.25 per tube. (Aff. of Alan Webb, ¶3). That is just under a 100% markup which, assuming the markup of the hand sanitizer was comparable, translates into nearly a $923,912.77 profit to Walmart on these alleged fraudulent transactions. So in the four and one-half months that Plaintiffs and Walmart engaged in these transactions (October 2008 through February 2009) Walmart profited in an amount in excess of $900,000.00. It has not elected to sue for damages for obvious reasons.

Instead, Walmart seeks the second remedy available to a victim of fraud – rescission. A defrauded party may "rescind the tainted contract and, returning what he has received, recover all he has parted with under the contract." Hatch, 1 N.W.2d at 360. (emphasis added). Walmart cannot affirm in part and rescind in part. If it wants rescission, it must return what it received. Since much of the product has been resold it can only return what it sold the product for. With its 100% markup, Walmart is in the

remarkable position of having received for more than it owes for the products and so would have to return $1,847,822.54 ($923,912.77 x 2) under <u>Hatch</u> to obtain recission as a remedy.

Obviously Walmart has not offered to do that, which leads to ratification.

B.    <u>Walmart Ratified Any Claimed Fraud</u>.

"One who may avoid a contract for fraud ratifies it by accepting and retaining the benefits thereof." <u>Proulx v. Hirsch Bros., Inc.</u>, 155 N.W.2d 907, 912 (Minn. 1968). Walmart clearly accepted and retained the benefits of any "fraud" in receiving over $1.8 million from its customers on sales of Plaintiffs' products, and paying only $923,912.77 to Plaintiffs.

Additionally, in order to rescind based on fraud, a party must, after discovery of the fraud, "promptly repudiate the contract and tender back what he has received under it." <u>Everson v. J.L. Owens Manufacturing Co.</u>, 176 N.W. 505 (Minn. 1920); <u>see</u> <u>also</u> <u>Shell Petroleum Co. v. Anderson</u>, 253 N.W. 885 (Minn. 1934) (continuing under the lease and collecting rent and commissions after discovery of the fraud constitutes affirmance).

In this case, Walmart knew about the "fraud" it now relies on to rescind as far back as October 2008 when Webb Candy explained what it was doing to the Apple Valley store manager; and Walmart corporate was expressly informed in writing on November 4, 2008. Walmart knew it was dealing with Webb Candy selling through Little i as of that time. It began its investigation in November 2008 but did not notify its stores to stop Webb Candy's sales through Little i and LSM until early or mid February, giving the

individual stores until the end of February to return product, if they wanted to return the product. Throughout this time period, Walmart continued to order the product, continued to sell the product and continued to reap the 100% profit, and continued to make payments totaling $923,912.77 for the product.[17] Walmart is just like the defendant in Shell Petroleum, who continued to function under the relationship, collecting the benefits of that relationship after discovery of the "fraud." That is a ratification, or as the court in Shell Petroleum stated, "[i]f that is not affirmance, with knowledge of fraud, real or merely alleged, there can be no affirmance. And once a contract induced by fraud has been affirmed by the defrauded party with knowledge of the deception, he cannot thereafter disaffirm for the same fraud." Id. at 887. Walmart cannot, after affirming the "fraud" and reaping the benefits, disaffirm for the same fraud. It has ratified any alleged fraud, and its motion for summary judgment to void the contracts must be denied.

C.    Walmart Did Not Have the Right to Reject the Goods.

Walmart argues that in the event that it is not allowed to void the contract, then it had the right to reject the goods because the goods were supplied by Webb Candy instead of Little i or LSM, and therefore, the goods do not conform with the "perfect tender" rule. Minn. Stat. § 336.2-601. This argument ignores the evidence showing that Walmart unequivocally knew who was supplying the product as set forth above, and for that reason alone Walmart's argument for rejection fails.

---

[17] Walmart did not pull issue a pull order until after March 18, 2009. (Carter depo. 31:19-24; Aff. of SM Exh. 3; Malley depo. Exh. 15; Aff. of SM Exh. 2).

Walmart's position also ignores business reality. Seth Malley testified that Walmart buys product from suppliers who do not manufacture the product themselves and also purchases product through sales agencies that don't own the product. (Malley depo. 47:18-25; Aff. of SM Exh. 2; Carter depo. 53:11-14; Aff. of SM Exh. 3). Walmart admits that the Supplier agreement does not limit a supplier from selling product manufactured by another entity, if that is what Walmart asserts occurred here. (Carter depo. 50:9-16; Aff. of SM Exh. 3).

LSM is a prime example of this type of supplier. LSM was an approved supplier to Walmart to sell products even though it had no employees, it was jointly owned by two separate entities— Promo Advantage Marketing Group and HBC Corp.— and it did not manufacture its own products. (Wilhelm depo, 7:10-8:5; 12:13-22; 39:25-40:8; Aff. of SM Exh. 12). The products originally sold to Walmart by LSM before the joint venture with Webb Candy were: (1) sourced by HBC Corp. from Bell Pharmaceutical. (Id. at 18:25-19:8); (2) sold to Walmart using HBC's employees (Id. at 12:13-22); and (3) the labeling was done by HBC Corp. (Id. at 19:9-11). Walmart never complained about the way LSM performed those sales.

The practical effect of the arrangement between Little i and Webb Candy and later LSM and Webb Candy is in reality no different in the instant case. Among other things, the products sold to Walmart under the joint venture between LSM and Webb Candy were: (1) sourced by Webb Candy from Oukay Cosmetics; (Webb depo. 24:23-25:7; Aff. of SM Exh. 4); (2) sold to Walmart using Webb Candy's employees; (Id. at 16:15-18); and (3) the labeling of the product was arranged by Webb Candy. (Id. at 31:18-21).

The relationship between Webb Candy and LSM was simply a joint venture. In fact, Larry Wilhelm, the former owner of LSM, testified that he has been in the sales industry for 38 years, including being involved with other companies that made sales to Walmart, and it is a common scenario for a product to be developed or manufactured by one party, sold to another party, and then a third party may sell the product to a retailer. (Wilhelm depo. 9:5-13; 40:16-24; Aff. of SM Exh. 12).[18]

For Walmart to argue at this point that Little i or LSM was selling product from a supplier (Webb Candy) that had no track record with Walmart ignores how Little i and LSM had always supplied product to Walmart, which it sourced from other suppliers with no track record with Walmart and with no objection from Walmart. This argument was simply manufactured by Walmart after the fact to avoid paying for product it ordered. Walmart admits that Little i and LSM were vendors with a proven track record, and the product at issue was sold through those entities.

If Little i and LSM were acceptable vendors when they sourced the product from other third parties, what would it matter to Walmart if they later sourced the product from Webb Candy?

Moreover, rejection must be within a reasonable time after delivery of the goods. Plaintiffs addressed this issue at length in their Memorandum in support of Summary Judgment at pages 12-15, and incorporate that argument here. Walmart cannot reject the goods it ordered and received. There is no support for its argument that it had the right to

---

[18] Little i also does not manufacture its own products. (Aff. of Alan Webb, ¶7).

reject, and any attempted rejection was well after a reasonable time from delivery of the goods.

Walmart shows that it has in its warehouses $362,404 in special order product that it ordered, received, and has not paid for. *See supra* p.14. Walmart also shows that it owes $150,103.09 for product it has sold at retail but has not paid Plaintiffs for. The total owed, using Walmart's figures is $512,507.09.[19] Walmart's Motion for Summary Judgment dismissing Plaintiff's claim for breach of contract must be denied.

## II.     UNJUST ENRICHMENT/QUANTUM MERUIT/ESTOPPEL

Plaintiffs pleaded claims for unjust enrichment/Quantum Meruit/estoppel in the alternative in the event the Court finds that no contract existed. Plaintiffs have argued in their motion for summary judgment and above that the orders from Walmart and shipments to Walmart amount to a contract for the sale of the goods at issue. If a contract is not found by the Court, Plaintiffs are still entitled to the reasonable value of the products ordered and shipped under their equitable theories. See Norwest Bank Minnesota v. Ode, 615 N.W.2d 91, 96 (Minn. 2000). Walmart argues to avoid paying for the goods that Plaintiffs had unclean hands. This is simply a restatement of its previous argument on misrepresentation, and Plaintiffs incorporate their same responsive arguments here.

Walmart also argues that it has not been enriched because it received no benefit and it has attempted to return the product, but Webb Candy refused to take it back. The

---

[19] Plaintiffs moved for partial summary judgment in the amount of $424,345.29 because such amount is undisputed.

problem with Walmart's argument is that the product at issue was special ordered by Walmart with the local high school names and colors imprinted on the labels, and are virtually worthless to Plaintiffs.[20] The benefit to Walmart is that it received the goods it ordered. If Walmart does not want to resell those products that is its own decision, but it does not mean that it has not received a benefit. If someone bought a car and decided to leave it in the garage, it doesn't mean they don't have to pay for it.

"Where recovery is sought as upon a quantum meruit, the contract price, as far as practicable and equitable, furnishes the measure of damages." Confer Bros. v. Currier, 204 NW 929, 931 (Minn. 1925). The contract price was set forth on the invoices, and Walmart's own figures show it owes $152,507.71 for goods it received and sold but has not paid for, and it owes another $362,404 for goods it received and retained in its warehouses that it has not paid for. See supra p.14.

In order to prove its estoppel claim, Plaintiff's must show that promises were made, that it relied on those promises, and that it will be harmed if estoppel is not applied. Northern Petrochemical Company v. United States Fire Ins. Company, 277 N.W.2d 408 (Minn. 1979). All three elements exist, and in the event no contract is found to exist, Plaintiffs claim for estoppel is appropriate.

The promises from Walmart were the promises to pay for the orders for the specialized goods it placed. Walmart ordered the goods and promised to pay for them. Plaintiffs relied on those orders when they shipped the product, and Plaintiffs will be

_____

[20] Walmart does not mention anything about the $152,507.71 it admittedly owes Plaintiffs for product it sold but did not pay for. See supra p.14. Its argument is focused solely on the goods it has retained in its warehouses.

harmed if Walmart is not estopped from backing out of its promise. It is wrong for Walmart to order the goods and induce Plaintiffs to ship them, and then not pay for them. Equity and good conscience dictate that Walmart pay for the goods ordered and delivered.

## III.    UCC CLAIMS

Walmart argues that UCC remedies are not available to Plaintiffs for the same reasons that breach of contract remedies are not available. Plaintiffs have addressed the breach of contract remedies (*see supra* beginning at p.14) and have addressed the UCC remedies in their memorandum in support of partial summary judgment (ECF 40), and Plaintiffs incorporate those arguments here.

**CONCLUSION**

Walmart ratified any claimed fraud and is not entitled to recission. Walmart ordered the goods, Plaintiffs shipped the goods, and Walmart should be ordered to pay for the goods. Its motion for summary judgment seeking to avoid payment should be denied.


                                                    **WATJE & MOORE, LTD.**

Dated:  March 2, 2011.              _____/s/ Steven Moore_____
                                                    GALEN E. WATJE (#114790)
                                                    STEVEN MOORE (#252463)
                                                    smoore@watjelaw.com
                                                    7900 Xerxes Avenue South, Suite 2000
                                                    Minneapolis, Minnesota 55431
                                                    Telephone:    (952) 646-9991
                                                    *Attorneys for Plaintiffs*