1        UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                              )
      Webb Candy, Inc. and Licensed    )   File No. 09-CV-2056
4     Sports Marketing, LLC,           )          (PJS/JJK)
                              )
5          Plaintiffs,                 )
                              )   Minneapolis, Minnesota
6     vs.                              )   March 23, 2011
                              )   9:00 a.m.
7     Wal-Mart Stores, Inc.,           )
                              )
8          Defendant.                  )
      ------------------------------------------------------------
9

            BEFORE THE HONORABLE PATRICK J. SCHILTZ
10              UNITED STATES DISTRICT COURT JUDGE
                      **(MOTIONS HEARING)**
11

      <u>**APPEARANCES**</u>
12     **For the Plaintiffs:**        **WATJE & MOORE, LTD.**
                                **STEVEN C. MOORE, ESQ.**
13                               7900 Xerxes Ave. S, #2000
                                Bloomington, MN 55431
14

       **For the Defendant:**         **FREDRIKSON & BYRON, PA**
15                               **RICHARD D. SNYDER, ESQ.**
                                200 S. 6th St., #4000
16                               Minneapolis, MN 55402-1425

17     Court Reporter:          DEBRA BEAUVAIS, RPR-CRR
                                300 S. 4th St., #1005
18                               Minneapolis, Minnesota 55415

19

20

21         Proceedings recorded by mechanical stenography;
      transcript produced by computer.
22

23

24

25

1    **P R O C E E D I N G S**

2                    **IN OPEN COURT**

3        THE CLERK:  All rise.  United States District

4    Court for the District of Minnesota is now in session, the

5    Honorable Patrick J. Schiltz presiding.

6        THE COURT:  Good morning.  Please be seated.  All

7    right.  We are here this morning on the case of Webb Candy,

8    Inc. and Licensed Sports Marketing, LLC v. Wal-Mart Stores.

9    The case is Civil No. 09-2056.

10       If I could have the attorneys make your

11   appearances, please, beginning over here (indicating).

12       MR. MOORE:  Good morning, Your Honor.  Steve Moore

13   on behalf of the plaintiffs.

14       THE COURT:  Good morning, Mr. Moore.

15       MR. SNYDER:  Good morning, Your Honor.  Richard

16   Snyder on behalf of defendant Wal-Mart.

17       THE COURT:  We have cross-motions today.

18   Mr. Snyder, why don't I talk to you first, if I could.

19   Thank you both for making your way in on a bad day today.

20       MR. SNYDER:  It was a little bit of a white

21   knuckle experience.

22       THE COURT:  It was for me as well.  My whole

23   family is in the Dominican Republic right now, except for my

24   son.  So I had to wait for his school bus and then try to

25   make it.  I didn't make it in by a lot to spare today.  Who

1    knew at the end of March we would have to deal with this.

2            Mr. Snyder, let me ask you first -- there is a lot

3    of briefing back and forth on the issue of the authority of

4    store managers.  And I can't tell whether we have a

5    disagreement about this or not.  Does a store manager at a

6    Wal-Mart store have the authority to order a local product,

7    such as lip balm with a high school name on it, as long as

8    the vendor offering that product has an approved number, has

9    a vendor number?

10           MR. SNYDER:  The local program permits store

11   managers to buy products on a local level.  So they have the

12   authority to do that.  Not just anyone can come in and sell

13   a product to a Wal-Mart store.

14           THE COURT:  Has to be an approved vendor?

15           MR. SNYDER:  Yes.

16           THE COURT:  We spent a lot of space on this in the

17   briefs.  I couldn't tell if you disagreed or not.  I don't

18   know why -- I don't mean to be critical of you, but your

19   brief seemed cagey on this point.  You briefed the national

20   program.  You say national this, national that, but they

21   have never claimed that they went through corporate or that

22   this was -- they were approved to go through corporate, but

23   they claim that.  I understand the whole dispute here is

24   over the fact that Webb Candy wasn't a licensed Wal-Mart

25   marketer.

1         So if it had been an approved vendor, had an

2    approved number, there would have been nothing wrong with

3    taking these particular products into local store managers

4    and trying to persuade store managers to order, right?

5         MR. SNYDER:  It still has to be vetted through the

6    buyer.  Anything going through the store is being vetted by

7    a buyer.

8         The difference between the national program and a

9    local program is under the national program the buyer

10   actually manages all aspects of the sale, including making

11   sure that the stores are stocked with the product.

12        On the local program that responsibility goes to

13   the store manager.  So if they want more, they have to

14   reorder it or they have to maintain their own inventory and

15   pay attention to it themselves.

16        But it doesn't mean that they can go out and just

17   buy any product that they want.  If someone pulls up with a

18   truckload of chainsaws, I mean, they can't buy it even if

19   it's a good deal.  It has to go through and be approved by

20   Wal-Mart's home office.

21        THE COURT:  Well, I'm not sure I'm tracking with

22   you.  But for certain categories of things, like postcards

23   or like T-shirts with the local high school's insignia on

24   it, the store manager can buy those, can make the decision

25   to buy those from somebody that has a vendor -- who has been

1    approved as a Wal-Mart vendor, right?

2              MR. SNYDER:  Yes.

3              THE COURT:  And he doesn't have to go get a buyer

4    in Arkansas or somewhere else to approve it.  The store

5    manager can look at the T-shirts and say as long as they fit

6    within these categories of local -- I realize he can't buy

7    Hanes underwear from a local person.

8              The thing I want to make sure I have a clear

9    answer, if Webb Candy had had a vendor number from Wal-Mart,

10   if its application a couple years earlier had been approved

11   and it had a vendor number, it could have taken these lip

12   balms with the high school insignia on it to local managers

13   and local managers could have made a decision about whether

14   to stock them in their store, right?

15             MR. SNYDER:  No, not on something like this.  You

16   know, this is a product you are putting on your mouth.  I

17   mean, this isn't a T-shirt.

18             THE COURT:  Yeah, but it has the local high school

19   teams on it.

20             MR. SNYDER:  It's not apparel.

21             THE COURT:  So I believe --

22             MR. SNYDER:  They point to something in the 70

23   program or 70-type transactions that says it's appropriate

24   for high school apparel.  It says that.

25             But I don't think there is anything in the record

1    that says that someone can get anything into a store without

2    a buyer at least saying it's okay.  Now, for an object like

3    that, that might not be a big deal for a store manager to

4    call up and say this person wants to participate in our

5    local program.  The product looks fine.  And the buyer could

6    take a very hands-off approach in that instance.  But it's

7    still going through a buyer in every instance, Your Honor.

8         THE COURT:  So these products were stocked in over

9    900 Wal-Mart stores; is that correct?

10        MR. SNYDER:  It's a large number.

11        THE COURT:  Is there any evidence that any of

12   those store managers ever called down to Arkansas, sent one

13   of the lip balms with the high school insignia on it and

14   asked a buyer to approve the product?

15        MR. SNYDER:  No, I'm not aware that happened.

16        THE COURT:  You mean 900 store managers aren't

17   aware of the policy that you just told me exists in

18   Wal-Mart?

19        MR. SNYDER:  Well, I think they were telling the

20   store managers that they are selling -- they're an

21   authorized vendor to supply this product.  The vendor --

22   maybe the confusion is that the supplier authorization is

23   product specific really.  So when you go and go through this

24   national program or this local program and you submit your

25   product through the online application process and have it

1    reviewed by a buyer, it's for a product.  It's not for we're

2    a vendor, we can supply any range of products.

3            THE COURT:  I know it's me.  I'm not try to

4    express any criticism of you, but I'm really having trouble

5    following this.

6            When I go to Wal-Mart in Charlottesville and I am

7    Jockey and I want to provide Jockey underwear, I assume the

8    buyer has to approve it, the Arkansas buyer, the corporate

9    buyer, right?

10           MR. SNYDER:  The buyer for Jockey underwear has to

11   approve --

12           THE COURT:  Right, and then Jockey would ship

13   massive shipments to somewhere and it would be distributed

14   to Wal-Mart stores.  That's the way it would typically work,

15   right?

16           MR. SNYDER:  Right.

17           THE COURT:  If I was Jockey and I showed up to the

18   Apple Valley Wal-Mart store with a truck full of Jockey

19   underwear, I assume the local manager wouldn't buy the

20   underwear from me.  He would say that has to go through

21   corporate, through the regional distribution centers, right?

22           MR. SNYDER:  Well, it depends on what the supplier

23   wanted to do.  If the supplier wanted to supply just a

24   limited geographical region -- it's ten districts or less --

25   then they can sell that through the local program.  But it's

1    still going to be vetted through the buyer, and the buyer is

2    going to say whether or not they want that and whether the

3    stores are okay to purchase it or not.  So the buyer is

4    always involved, even for a program like that.

5              THE COURT:  What I am having trouble understanding

6    here is that these folks convinced 900 Wal-Mart store

7    managers to stock their products, their lip balms and their

8    hand sanitizers.  I understand that, in your view, they did

9    it by misrepresenting that they were an approved vendor.

10             There is no evidence that any of those managers

11   ever contacted corporate Wal-Mart about anything with -- I

12   know there is like three or four, maybe more, that said they

13   got product, but I just mean the typical thing here.

14             So how can you reconcile that with what you are

15   telling me, which is you're telling me that the store

16   managers would have understood not just that the vendor was

17   approved, but that the local high school lip balm was

18   approved?

19             MR. SNYDER:  I think that's probably what

20   happened.  I don't have evidence that anyone called the

21   buyer and said can we get this stuff.

22             THE COURT:  Obviously, the managers thought that

23   they had the authority to order these things.  Nine hundred

24   of these managers thought they had the authority to order

25   these things.

1        MR. SNYDER:  Yeah, I can't dispute that.

2        THE COURT:  So if Webb Candy had had a vendor ID

3    number, would you be claiming that the sales were

4    unauthorized of these products?  If Webb Candy had at some

5    point gotten a vendor ID number and these particular

6    products hadn't been vetted by corporate, would the local

7    store managers have had the authority to buy these

8    particular products from Webb Candy?

9        MR. SNYDER:  I don't know the answer to that

10   hypothetical.

11       THE COURT:  Okay.

12       MR. SNYDER:  That's not the facts of our case.  So

13   would they have had the authority to purchase?  They can

14   purchase on a local level from authorized suppliers.

15       THE COURT:  You're not arguing in this case, in

16   any event, that among the reasons that you have no

17   contractual obligations to Webb Candy is that store managers

18   didn't have the authority to buy this product even if Webb

19   Candy had a vendor ID number?  You are resting your case on

20   the fact that they didn't have a vendor ID number?

21       MR. SNYDER:  Yeah, on the facts of this case.

22   That's correct.

23       THE COURT:  Let me ask you this then:  Suppose you

24   have a vendor like LSM that has a vendor ID number.  Can

25   they sell products to Wal-Mart that they personally didn't

1    manufacture -- that is, can they buy products from other

2    people and sell them to Wal-Mart through their vendor

3    number?

4          MR. SNYDER:  Well, I think that's not a complete

5    hypothetical in the sense that we don't know whether these

6    products have been looked at by a buyer at the home office.

7    But, as a general matter, you don't have to be the

8    manufacturer of the product in order to sell it to Wal-Mart.

9    Wal-Mart works with intermediate entities in the supply

10   chain, from manufacturer to the retail store.  So they are

11   buying from an entity that did not itself manufacture the

12   product but has sourced it somewhere else, so that happens.

13   If that's your question, that happens.

14         THE COURT:  Suppose LSM buys these lip balms from

15   Webb Candy, and LSM goes down to Arkansas and it makes a

16   pitch to the lip balm buyer in Arkansas and he says great,

17   we will take them, and LSM then ships cases of Webb Candy

18   lip balms around the country.  I assume all that would be

19   fine, right?

20         MR. SNYDER:  Yes.  In that instance what has

21   happened is Wal-Mart has a contractual relationship with the

22   actual supplier of the product.  It's signed onto its

23   Supplier Agreement.  It's going to indemnify Wal-Mart in

24   case there is a product-liability claim.  It's going to have

25   its own product liability insurance.  The product is going

to be tested, and there is going to be evidence that this

product is safe to put on your lips.  Under that

circumstance, the buyer has gone through the process and

says if the buyer signs off on it, it's not a problem.  He

could have bought the same candy -- or the same product.

THE COURT:  Suppose someone like an LSM brings,

you know -- wants to distribute lip balms and it goes down

to whoever makes them, it goes down to Wal-Mart and Wal-Mart

says great, we want to distribute your product.  So it gives

them a vendor ID number and it buys however many million

cases of lip balm.  Okay?  And then suppose a couple years

later that LSM develops another product.  Do they have to

get that product approved before they can sell it to

Wal-Mart?

MR. SNYDER:  Yes.  Jason Mayhall, one of the

buyers, the buyer for lip balm actually in this case, was

responsible for lip balm, went and rejected this product,

said -- was asked that very question and he said that they

have to come back and get -- there's a new number that they

are going to get and he called it, I think, a sequence

number.  So in order to get this into the system, Wal-Mart

system to pay, you are going to have to have a number that

you are associating with this particular new product now.

So it is buyer approved.  And, like I said, I think

everything is supposed to be buyer approved in the system.

1          THE COURT:  Okay.  So even though Wal-Mart gives

2     vendor numbers and approves vendors, at least when you are

3     selling at the corporate level you also have to get

4     product-by-product approval?

5          MR. SNYDER:  And the local level, too.  The

6     material we submitted from their web page talks about the

7     local program.

8          THE COURT:  Yeah.  Okay.  If I understand it here,

9     there is three ways that you, as a distributor, can get a

10    product into a Wal-Mart store:  One is through the national

11    program.  One is through the local program, which is

12    regional or 10 stores or less or something, I can't remember

13    how it was.  But then there is this -- and I know there is a

14    dispute over exactly what this means, but it's what Webb

15    Candy has referred to as this 70-type procedure, which is

16    where a vendor shows up at the local Wal-Mart, talks to the

17    store manager and persuades the store manager to order

18    something directly from the vendor, which is delivered

19    directly to that store.  Obviously, there must be some

20    ability for store managers to do that because 900 of them

21    did it in this case.  Right?

22         MR. SNYDER:  Yes, but it's not a separate program.

23    I mean, there is nothing that anyone has presented to the

24    Court, because nothing exists, that says anyone can come in

25    and make a sale to a Wal-Mart store in that fashion.

THE COURT:  No, I'm assuming somebody that has a Wal-Mart vendor number.  But, at least in this case, store managers believing they were dealing with somebody with a vendor number had them show up or make a phone call and ordered from them directly and had them ship products directly to the store.  Now, that wasn't through the national program and that wasn't through the local program.  That was some kind of a direct vendor-to-store transaction, right?

MR. SNYDER:  Through the local programming.  That's how you would normally do that.  They're circumventing the rules here.  I mean, the rules are what they are, and you are supposed to do this.

Now, they are approaching these stores and they are making these sales, misrepresenting who they are.  And, you know, that's not anything that's authorized according to the rules.

THE COURT:  I understand that.  I want to try to separate the issue of the misrepresentation from what authority the store managers have.  I'm not sure whether I have quite nailed you down on this or not.

If I have a Wal-Mart vendor ID number and I have a product that is of local interest, like postcards or like lip balms with this high school logo on, can I call the store manager directly and is the store manager authorized

to make the decision himself to stock my product, my local product? I don't mean "local" in the Wal-Mart way. I mean "local" meaning it's the Apple Valley High School team. Do store managers have that authority?

MR. SNYDER: They have the authority to purchase, again, you indicated from a supplier that has been authorized.

THE COURT: Uh-huh.

MR. SNYDER: Normally what that means is that the product that that supplier is selling has been authorized as well. So when a store manager hears that, yes, I'm an authorized supplier, it's not that I am this class of entity that can sell anything to Wal-Mart, but the store manager understands in that instance, based on Wal-Mart's rules, is that that entity is authorized to sell this particular product that they're selling.

THE COURT: But there is no indication -- but you said -- a vendor gets product-specific approval, but what tells the -- if the store manager can only buy approved products from an approved vendor, someone with a vendor ID number, wouldn't the store manager have to ask the person calling them not only are you with LSM, but is this lip balm you are asking about an approved product?

MR. SNYDER: Well, I think the two things are interrelated. So that's why I'm thinking --

1          THE COURT:  I could be LSM and I could sell a

2     thousand products, one of which Wal-Mart has agreed to buy

3     from me and distribute, 999 of which it doesn't.  So when I

4     show up to a store manager and I've got a vendor ID number,

5     it does say whether that means Wal-Mart has vetted all my

6     products or one of 1,000 I sell.  So wouldn't a store

7     manager have to know whether the particular product you were

8     selling was approved by a Wal-Mart buyer?

9          MR. SNYDER:  Well, as I indicated, I think it's

10    one in the same thing in the mind of a store manager.  If

11    you are presenting yourself -- I have a product, I'm an

12    authorized supplier of this product is really what they are

13    saying.  That's the message they are conveying when they

14    call up these people.  I don't know expressly if there was a

15    discussion back and forth with the store manager, have you

16    been approved for this particular product or who is the

17    buyer for this particular product that approved this.  I

18    don't know if those conversations happened, but --

19         THE COURT:  What, I guess, I'm having trouble with

20    is if the assumption that the store manager is making is

21    that when I'm at -- if I am Mr. Henson and I call and I say

22    I'm with LSM and I have got some lip balms with high school

23    logos that we'd like to stock, if the manager is assuming

24    that that product has been approved by Wal-Mart, then why

25    isn't the product coming through the Wal-Mart distribution

1  centers rather than -- I would say, well, why are you

2  calling me?

3       MR. SNYDER:  Because the local programs -- you're

4  making local sales that aren't going through these

5  distribution centers because they are locally focused.  I

6  wish I could address your question, but I think I have.  I

7  mean, the answer is that someone presents themselves as an

8  authorized supplier.  They have a product.  Right?  The

9  assumption is they have been authorized for that product.

10      Now, could a store manager have called and talked

11 to a buyer?  I suppose they may have done that.

12      THE COURT:  Okay.  So you're saying that when a

13 store manager at whatever, the Cleveland Wal-Mart store,

14 gets a call and someone says, I'm Joe Blow, I'm with LSM and

15 I have got some lip balms I would like you to carry that he

16 understands the person saying I'm Joe Blow, I'm with LSM and

17 these lip balms have been vetted by a Wal-Mart buyer and a

18 Wal-Mart buyer has approved?

19      MR. SNYDER:  Exactly.  It would be crazy for a

20 supplier not to do that.  So if you have gone through the

21 process of becoming a Wal-Mart supplier, you have got this

22 coveted number now, are you going to jeopardize it by

23 violating Wal-Mart's rules and going out and selling

24 products that are renegade products that have never been

25 approved by anyone?  I think everyone would assume that if

1   you have that number, you have been approved for a product

2   and the product you are offering has been vetted because no

3   one would risk violating the rules and getting kicked out of

4   the program if that is not the case.

5           THE COURT:  Except that Little i did and LSM did.

6           MR. SNYDER:  They were making minor sales at that

7   point in time, and I think they realized their days at

8   Wal-Mart were done.  LSM wasn't selling anything actively at

9   the time, I don't believe --

10          THE COURT:  Okay.

11          MR. SNYDER:  -- or if they did, it was minor.

12          THE COURT:  Okay.  I think that that helps me.

13          All right.  Let me just look at my notes here for

14  a second.

15          Okay.  Let me talk about your fraud claim.  Let me

16  walk through the defenses that Webb Candy has thrown up to

17  your fraud claim.

18          First, Webb Candy argues that there was no

19  misrepresentation.  The heart of your misrepresentation

20  claim is that basically a salesman would call and say that

21  they were with LSM or with Little i and that was a lie.  It

22  was implying that they were employees of approved vendors

23  and they weren't employees of approved vendors, right?

24          MR. SNYDER:  And implying that this is an approved

25  product, that they have permission to sell this, and that

1    they have a vendor number.

2           THE COURT:  But your briefs I don't recall

3    focusing on this issue, that the lie is that this was an

4    approved product.  Your brief focuses on the fact that they

5    say that they're with somebody that has a vendor number.

6    The whole focus of your brief is how important it is that

7    the vendor be vetted, how important it is that the vendor be

8    someone Wal-Mart have confidence in.  I mean, your brief

9    focuses on the fact that they are saying that they're

10   employed by an approved vendor when they were in fact

11   approved by somebody who wasn't an approved vendor.

12          MR. SNYDER:  I didn't follow the last part.

13          THE COURT:  The lie that is the focus of your

14   brief, not exclusively, but the focus of your brief is these

15   people were calling and saying they were employed by --

16   implying that they were employed by an approved vendor when

17   in fact they were not employed by an approved vendor.

18          MR. SNYDER:  It's not just that.  The product that

19   they are selling -- that Webb Candy or that LSM were making

20   the call saying that they're an authorized supplier.  I

21   mean, that's the lie that -- the lie is that the Wal-Mart

22   store has the right to do business with this entity making

23   the sale when that's not the case.  So employed, not

24   employed, that's part of it, but the central lie is that

25   when you do business, when you form this contract, you are

1  forming a contract with an entity called LSM, which you are

2  authorized to enter into contracts with.

3      THE COURT:  Here's a question that bothered me

4  reading the papers:  Didn't they form a contract with LSM?

5  In other words, when a local store manager agreed to stock

6  this Webb Candy product and he got the invoice from LSM and

7  he sent the payment to LSM, wasn't he in fact in a

8  contractual relationship with LSM?  In other words, if

9  something had gone wrong, couldn't you have sued LSM?

10      MR. SNYDER:  I think that's the restatement we

11  cite that talks about that.  That's enough to form a

12  contract, but it's a voidable contract.  So it's not the

13  situation where the fraud is about some other issue that's

14  more fundamental that makes it void from the get-go.  This

15  is the kind of fraud that makes it voidable.  So, yeah, you

16  are right, there is a contract, but it's a voidable

17  contract.

18      THE COURT:  So there is a contract between a -- so

19  there is a contract -- but so much of your brief talks about

20  they think they're making a contract with an approved

21  vendor, they think they are making a contract with an

22  approved vendor, they were making a contract with an

23  approved vendor.  I mean, there wasn't -- the misleading --

24  this is a very, very odd case in lots of ways, one of which

25  is, is that the fraud here as portrayed in your brief is

1    that through their lies the Webb Candy people led the

2    managers to believe that they were making a contract with

3    LSM.  Well, they were making a contract with LSM.  I mean,

4    there wasn't a -- that's -- I don't quite understand --

5            MR. SNYDER:  But LSM wasn't the real party to the

6    contract is the problem.

7            THE COURT:  What do you mean?  They were on the

8    contract.  I mean, I assume, and you agree, that you

9    could've sued them.  They were obliged, that they have would

10   have all the obligations they have under the Wal-Mart

11   Supplier Agreement or under the contract.

12           So it's hard for me to grasp what the fraud here

13   is in that if the fraud is they are inducing people to make

14   contracts with someone that is an approved vendor -- they

15   did make contracts with someone who is an approved vendor,

16   so where is the --

17           MR. SNYDER:  They made a contract with Webb Candy.

18   Webb Candy supplied the products to them.  Webb Candy --

19           THE COURT:  How did they make a contract with Webb

20   Candy?

21           MR. SNYDER:  Webb Candy owned the products.  Webb

22   Candy, they own the products.  They did every part of the

23   sale.  That is the entity -- Webb Candy shipped the stuff.

24   Licensed Sports Marketing is sitting off on the side here.

25   It's not doing anything.

1          THE COURT:  It made a contract with you.  The

2     contract is with LSM.  In fact, I wonder whether in this

3     lawsuit Webb Candy as Webb Candy has the right to recover a

4     penny from you.  Webb Candy doesn't have any contract with

5     any Wal-Mart.  Where did Webb Candy sign a contract with a

6     Wal-Mart store?

7          MR. SNYDER:  It didn't.

8          THE COURT:  It didn't.

9          MR. SNYDER:  Right.

10          THE COURT:  I don't think Webb Candy has any

11     rights in this lawsuit whatsoever.

12          MR. SNYDER:  That's true.

13          THE COURT:  And you argue that in your brief with

14     respect to Little i, and I agree with you.  What are they

15     doing here asking for money that you owe Little i?  If you

16     owe anybody, you owe Little i.

17          So, for one thing, I don't understand why you

18     haven't moved to dismiss Webb Candy.  I don't know why they

19     would have any rights here whatsoever.  And, in fact, they

20     are in a bit of a bind because if their argument is that we

21     have a contractual relationship with these Wal-Mart stores,

22     then they were inducing the stores to contract with someone

23     the stores didn't think --

24          MR. SNYDER:  They have a quantum meruit claim in

25     this case.  They are saying even though we're not parties to

1    these contracts, these contracts are invalid, we were

2    entitled to the benefit of it.  So they're arguing that.

3              THE COURT:  Not against the Wal-Mart store.

4              If my buddy makes a contract with Wal-Mart and he

5    agrees to sell 1,000 widgets to Wal-Mart and then he comes

6    over to me and says would you please send 1,000 there and I

7    will pay you for them and I send the 1,000 and he doesn't

8    pay me, I don't think I have any rights against Wal-Mart.  I

9    have rights against him, not against Wal-Mart.

10             MR. SNYDER:  But there is no contract with LSM.  I

11   mean, there is a contractual agreement.  There is an offer

12   and acceptance.  The offer is made by Webb Candy.  The store

13   --

14             THE COURT:  Acting on behalf of LSM.  Webb Candy

15   who says I'm calling you, I'm with LSM, who negotiates this

16   deal purporting to represent LSM, who when the deal is

17   closed sends an invoice from LSM, payment being made -- how

18   does a contract with Webb Candy get formed under those

19   rights?

20             MR. SNYDER:  I don't think it does.

21             THE COURT:  I don't think it does either.

22             MR. SNYDER:  There is a contract with LSM that's

23   voidable because what was told about that contract is a

24   misrepresentation because LSM is not the entity making these

25   sales.  It's somebody else.  It's the identity problem.

1    It's the restatements example where someone goes to the bank

2    and says I'm Mr. Jones, a millionaire, I want a loan and

3    they give him a loan.  Those parties have a contract.  But

4    it's voidable because it's in the wrong name.  He isn't

5    Mr. Jones.  He is somebody else.  So the bank can honor that

6    contract with Mr. Smith or whoever it is.

7            THE COURT:  I don't think that's what happened.  I

8    mean, it's a case that just makes my head spin.

9            You know, at one level what we have here is an

10   accusation that Webb Candy employees called Wal-Mart

11   managers and implied they were with LSM, induced Wal-Mart

12   managers to make a contract with LSM for lip balms.  The lip

13   balms were then delivered.  They were precisely the product

14   ordered except for the fact that they, LSM -- which I think

15   has the contract, the contractual responsibility -- LSM got

16   them from Webb Candy essentially or told Webb Candy to do

17   the delivering.  Wal-Mart then sells these things.  You

18   might not agree with the exact amount, but it sounds like

19   Wal-Mart made a ton of money off of the ones that they sold.

20   I mean, they sold millions of these units and made a 50

21   percent mark-up.  So now Wal-Mart, having made a million

22   dollars as a victim of fraud, based upon -- I mean, we don't

23   have many cases where people who profit -- victims of fraud

24   profited to the tune of a million dollars and are seeking

25   legal remedies.  So I'm having --

1          MR. SNYDER:  We're seeking equitable remedy.

2     We're seeking to void these contracts.

3          THE COURT:  No, you are seeking to void part of

4     the contract.  You want to keep the million dollars in

5     profit you made off of half of the contract.  I mean, this

6     fight is -- on the other hand, we have Webb Candy, whose

7     employees called and lied through their teeth and who

8     profited even if we today burn all these remaining lip balms

9     and everybody goes their own way.  So basically this whole

10    lawsuit is about how much more you are going to profit or

11    they are going to profit from the deal.  Right now, as

12    things stand here, you both made money off this deal.  We're

13    in here having a fight in federal court about who is going

14    to profit more essentially or not have more profit.

15          So the fraud here again, to get back to the fraud,

16    is by saying they were with LSM they induced a store manager

17    to make a contract with what he thought was LSM, which I

18    think he did.  He did make a contract with LSM.  LSM had the

19    contractual responsibilities.

20          Now, it could be the second layer you are talking

21    about is really the fraud -- although, it's not the focus of

22    your brief -- which is the store manager not only was

23    induced into thinking he was making a contract with LSM,

24    which he was, but he was induced into thinking he was buying

25    an approved product, which he wasn't.  But that really isn't

1    the focus of your briefing.  The focus of your briefing was

2    on the identity of the vendor.

3            MR. SNYDER:  Again, I mean, they are one in the

4    same thing.  You present yourself as an authorized supplier

5    and you are an authorized supplier of unauthorized product.

6            THE COURT:  You argue in your briefs, for example,

7    lack of conformity.  You don't argue that the reason they

8    didn't conform is because the product wasn't approved.  You

9    argue that the reason it didn't conform was because it

10   wasn't the right person selling it to you.

11           MR. SNYDER:  That's right.  That's right.  This is

12   the entity that Wal-Mart has rejected.  We're not going to

13   do business with you.  But now we're being forced to do

14   business with them.

15           THE COURT:  But you are not doing business with

16   them.  I'm trying to explore -- I'm not being rhetorical

17   here.  It's a very hard case, for me at least, to figure

18   out.

19           You didn't do business with them.  You did

20   business with LSM.  Your contract is with LSM, it seems to

21   me.  LSM basically used Webb Candy to fulfill LSM's

22   contractual obligations, and LSM then passed on the bulk of

23   the money it got.

24           MR. SNYDER:  It's not LSM's product.  It's not LSM

25   calling up the stores saying we have this product.  It's

Webb Candy.  And it's not the party who we think we're
entering into contracts with that we're actually entering
into contracts with.  The party that's fulfilling this
contract is not the party who we think is going to be
fulfilling this contract, and that's it.  We're entitled to
do business with who we want to do business with.

THE COURT:  I agree.  But the problem is you did
do business with who you thought you were doing business
with because the contract if it exists, I think, is between
you and LSM.  That's who you thought you were doing business
with.  That's who you ended up doing business with.

MR. SNYDER:  That's what the invoices say.

THE COURT:  That's what the invoices say.

Let's say if you hadn't gotten all the lip balms
you were supposed to get and you wanted to get the lip balms
and they weren't delivered, I assume you would have to sue
LSM for the lip balms, not Webb Candy.  So that's the odd
thing about it.

The argument I'm making with you is not an
argument that Webb Candy made in its briefs either.  We are
stuck here with you making one set of arguments, them making
another set of arguments, and me thinking a third way about
the case.  I don't quite know what to do about it.

All right.  Let me ask you about a couple other
issues.  Webb Candy talks about its relationship with LSM

1    differently than with Little i.  With Little i they seem to

2    concede that they were -- basically Little i, they just

3    rented the vendor number or paid for use of the vendor

4    number.  But they keep talking about how they were in a

5    joint venture with LSM.  Part of the deal was they would

6    also try to market LSM products at the same time they were

7    marketing Webb Candy products.  What does the record show

8    about that?  Did they in fact push LSM products when they

9    were making these calls?  Were there LSM products that were

10   delivered as part of these contacts between Webb Candy and

11   Wal-Mart stores?

12        MR. SNYDER:  No.  LSM had some products.  None of

13   them were sold to Wal-Mart stores.  The license, I think,

14   expired in the end of December of 2008.  It was a very short

15   window left of time to sell these things.  Licensed Sports

16   Marketing had given up on selling them.  That part is not --

17   that aspect of their relationship is not significant.  They

18   never attempted to --

19        THE COURT:  Is there evidence that they set out in

20   a different way than they set out with Little i; in other

21   words, that the discussions and negotiations resulted in a

22   different sort of plan, even if it didn't come to fruition

23   with LSM, than the plan with Little i?

24        MR. SNYDER:  You know, the story that's being told

25   about LSM is really not what's accurate.  I mean, this idea

1   is that -- with the story they are telling is, well, we had

2   this deal with Little i and then we switch over to LSM.

3   Well, actually, they were using LSM's number from day one.

4   So they were kind of jointly making -- I have a timeline

5   that I brought, if I could maybe kind of go through that.

6           THE COURT:  Sure, if you have got one.  I made my

7   own based on the briefs, but I will take any help I can

8   gather with figuring out the facts.

9           Here, I'm confused about this and I don't remember

10  reading this in the briefs.  So they were marketing under

11  LSM's number at the same time they were marketing under

12  Little i's number?

13          MR. SNYDER:  Yeah.  I think even in the complaint

14  it talks about that.  But, yeah, the very first

15  transaction -- and I put the invoice, the second one, behind

16  the timeline.

17          THE COURT:  Well, what about the representation --

18  I don't remember -- I guess it was in Webb Candy's brief

19  where they said, I think it was, November 26th, or something

20  like that, they terminated the relationship with Little i

21  and they began their relationship with LSM.  So that's just

22  not true?  They were using LSM's number long before -- not

23  long -- nothing here happened long before anything else, but

24  -- yeah, in the brief Webb Candy says they terminated their

25  agreement with Little i and they entered into a similar

1  agreement with LSM on November 25th, 2008.  You are saying

2  that two months earlier they were already using the LSM

3  number?

4          MR. SNYDER:  Right.  There was a written agreement

5  dated November 25th.  I think that's in the record.  It

6  confirmed this agreement.  But the agreement itself goes

7  back to when they first started.  The order date on the

8  first Licensed Sports Marketing invoice is September 29th of

9  2008.  I have a red rope of other sales in LSM's name made

10 during October and November and really up until January

11 15th.  I put that as an attachment to the timeline as well.

12 That was the last sale.

13         THE COURT:  During this time when you have both

14 the green bar and the yellow bar, this period of time when

15 they are both there, why would they -- if they are paying

16 Little i five percent and LSM three percent, why would they

17 make any sales under Little i's number?

18         MR. SNYDER:  I don't know.  You would have to ask

19 Mr. Moore that.

20         THE COURT:  If they are both dealing with -- if

21 they have permission to use both the Little i number and the

22 LSM number during this period of time, who were the

23 employees when they would call saying they were with then?

24         MR. SNYDER:  Well, whoever's name is on the

25 invoice is who.

1          THE COURT:  But the invoice follows the call.

2          MR. SNYDER:  Right.

3          THE COURT:  When I pick up the phone and I call,

4     do I say I'm with Little i?  If it's October 3rd of 2008

5     when a Webb Candy employee would pick up the phone and call

6     a Wal-Mart manager, would she say I'm with Little i or would

7     she say I'm with LSM?

8          MR. SNYDER:  Richard Twistol has that in his

9     deposition.  He is one of the salespeople.  He said whatever

10    name was on the invoice that ultimately got sent is the same

11    name that I used when I called.

12         THE COURT:  Oh, I see.  But how would he choose

13    which name?  So he is sitting there at his desk and he is

14    calling the Wal-Mart in wherever, Poughkeepsie, how could he

15    decide which name to use on the phone?

16         MR. SNYDER:  I don't know.

17         THE COURT:  That doesn't come up in the

18    depositions?

19         MR. SNYDER:  No -- well, in the depositions they

20    said, yeah, we originally started -- I mean, they -- this is

21    what the record shows is kind of what their story is, which

22    is that we started out as Little i and then at some point

23    there was a switch over to LSM and so --

24         THE COURT:  But you say there wasn't any such --

25    that didn't happen.  You have got them making sales under

1      both names basically from the same date.

2            MR. SNYDER:  That's right.  The story they told is

3      what's in the record, and that's not reflective of what the

4      records actually say.

5            THE COURT:  Okay.  That's something else I didn't

6      really understand from the briefs.  I thought this was

7      sequential.

8            MR. SNYDER:  In fairness, Your Honor, these

9      invoices have not been submitted to the Court.  You know, I

10     have them through discovery, but they haven't really

11     identified which of these invoices they are even saying are

12     unpaid at this point in time to us.

13           But the reason I think that I wanted to do this in

14     a timeline is that, you know, they raise so much in their

15     brief about, well, you knew all along and that's just not

16     the case.  They point to this November 4th e-mail.

17           THE COURT:  Let me get to that just in a second.

18     They have the 11 points that they say, 11 points of

19     knowledge or whatever they would be, that I want to run you

20     through.

21           Before we get to that, let me -- for you to be

22     able to void the contract, there needs to be a

23     misrepresentation.  We have talked about whether there was a

24     misrepresentation.

25           Do you agree that under the law any

1    misrepresentation would have to be material?

2              MR. SNYDER:  Material or fraudulent, yes.

3              THE COURT:  It has to be material.  Yeah, in fact,

4    it's the "or" -- it could be either or.  It could be

5    fraudulent.  But a fraudulent misrepresentation would have

6    to be material, I would think.  If you were lying about

7    something that didn't matter to Wal-Mart, they didn't care

8    about, it wouldn't -- if you said your name was Kerry and

9    you said it was spelled with a K when in fact it was spelled

10   with a C, it would not allow Wal-Mart to void the contract?

11   Even though it was fraudulent, it wouldn't be material,

12   right?

13             MR. SNYDER:  I can't argue with that.

14             THE COURT:  All right.  And your material

15   argument, again, is that it matters a lot to Wal-Mart --

16   well, I don't want to take us through this again.

17             Let's talk about the justifiable reliance point.

18   And it's a little hard for me to follow the legal category

19   into which Webb Candy is putting this when they talk about

20   you knew you were dealing with Webb Candy.  I don't know if

21   that means that you were defrauded because if you look at

22   the communications as a whole they weren't fraudulent or if

23   it means even if they were fraudulent, your reliance wasn't

24   justifiable because you had enough knowledge of what was

25   going on.  I'm not quite sure what legal category this fits

in.

But let me just take you quickly through these 11 points. Some of them I agree with you and we don't have to say a lot about.

Point one was Alan Webb told Luke, the manager of the Apple Valley store, that Webb Candy wanted to sell to Wal-Mart. Now, that's one guy at one store so it doesn't mean anything to me, so I agree.

MR. SNYDER: That claim is not in the case.

THE COURT: Right. That has nothing to do with anything.

Secondly, Twistol -- and I'm just taking this out of Webb Candy's brief -- Twistol testified that he initially introduced himself as being with Webb. Now, he is talking about when he went out to talk to Luke?

MR. SNYDER: Yes.

THE COURT: This isn't that he was introducing himself as being with Webb when he was calling?

MR. SNYDER: No, he is talking about a meeting with Luke.

THE COURT: Okay. So that's also an Apple Valley specific issue.

Third, Alan Webb had Luke review the invoice with Little i's name before Webb Candy started selling to Wal-Mart stores. And, again, this is Apple Valley, not

1  Wal-Mart generally.  And, as you pointed out, this is, of

2  course, after they have already made deals to use at least

3  Little i's number.

4        Do we know when they made the deal to use LSM's

5  number or do we just know when the first invoice went out

6  under LSM's number?

7        MR. SNYDER:  Well, the testimony from the owner

8  of -- or former owner of Licensed Sports Marketing was that

9  it was in late October or early November that they came up

10  with the agreement and then reduced it to writing and on

11  November 25th --

12        THE COURT:  Well, you have a September 19th

13  invoice going out with LSM's number.

14        MR. SNYDER:  Yeah, September 29th.  Yes.  And a

15  whole bunch of others in October and November.

16        THE COURT:  Well, if they didn't reach this

17  agreement until October, how could they be using LSM's

18  number before that?

19        MR. SNYDER:  I believe they must have had an

20  agreement earlier than what they say.

21        THE COURT:  Oh, you think that the LSM owner was

22  either mistaken or was not being truthful about the timing?

23        MR. SNYDER:  Yes.  I mean, it would have to be

24  because they had his number.  When they used the number

25  right away at the end of September, they were, obviously,

1    having his number.  The only way they can get that -- it's

2    not a number that everyone knows, only the owner knows.

3             THE COURT:  Let me just ask you, you have

4    submitted here an invoice from September 26th using the LSM

5    number.  Do they continue steadily then after September

6    26th?  There isn't, like, one invoice and then none for a

7    month and then another invoice?

8             MR. SNYDER:  They continued steadily.

9             THE COURT:  Okay.  So this isn't a mistake or an

10   outlier, this one invoice from September 26th?  It's the

11   start of a steady drip, drip, drip, drip of LSM deals?

12            MR. SNYDER:  That's correct.  And I brought them

13   with me in case there is any disagreement about that, but

14   that's true.

15            THE COURT:  Webb Candy talks about sort of the

16   pervasiveness of the Webb name, that the lip balms were

17   labeled distributed by Webb Candy; the UPC code if you

18   scanned it, it would come up, I assume on the cash register,

19   Webb business promotions; that the displays had Webb Candy's

20   name and telephone number; that some stores would reorder

21   directly from Webb Candy; that when you called the telephone

22   number, it was answered Webb Candy.  Now, I recognize one

23   point is, of course, that none of this happens unless the

24   stuff is in your store, which means you've already been

25   duped into buying it or you have already decided to buy it.

So none of this would explain why the manager wasn't fooled
initially when he bought it.

But what is your response to Webb Candy's argument
that at least once the stuff is there in the store Webb
Candy's name is all over this thing and so the notion that
we're shocked to find out that we're dealing with Webb Candy
is not credible given that Webb Candy's name is everywhere
you look once the stuff is in the store?

MR. SNYDER: Well, the legal context in which they
are raising this is not exactly clear to me. I think they
are raising it and you are not justified on relying on what
we tell you because you know the truth. Now, that all --
you are right, it all happens after this contract is formed,
so I don't think it really applies to that. But the
standard under justifiable reliance is actual knowledge of
the fraud, not should have known. I don't think that they
are saying that any of the store managers ran down when this
stuff arrived, picked up the thing and read the fine print
on the label that says distributed by Webb Candy. I'm not
sure what that even -- even if he had, I'm not sure what
that would say, other than maybe Webb Candy is somewhere in
this chain of distribution as well. So I don't think that
the fine print items really affect justifiable reliance at
all because it's not actual knowledge and there is no
evidence of actual knowledge.

1    THE COURT:  I know you cited to me from the

2    restatement.  You cited an example given in the restatement

3    that a negligent failure to discover the truth, it's not

4    making reliance unjustifiable.  I just didn't have time to

5    research this myself.  How do you distinguish justifiable

6    reliance from unjustifiable reliance?  What's unjustifiable

7    reliance if it's not negligent?

8    MR. SNYDER:  Well, if you actually know.  If you

9    know at the time.  You can't say that -- if they had said to

10   a store manager, well, we're really using someone else's

11   number - wink wink - and then the bill shows up or the

12   invoice shows up or the invoice shows up --

13   THE COURT:  Then you wouldn't even have a -- but

14   if you actually --

15   MR. SNYDER:  It's still false.  It's still a false

16   representation.  So it still meets the requirement that it

17   is a false representation.  It meets the requirement.

18   Whether you know about it or not doesn't make it false or

19   unfalse.  The question is, well, are you justified in

20   relying on this when you know it's false.

21   THE COURT:  Not only actual knowledge of this

22   misrepresentation that makes the reliance unjustifiable?

23   MR. SNYDER:  Yeah.  The restatement is very clear

24   on that.  We cited some Minnesota case where someone didn't

25   read the contract and when they did -- when they did get

1    actual knowledge, now they have the basis to rescind the

2    contract.

3         So this stuff about a manager knowing, there is no

4    evidence of actual knowledge.  I mean, they are trying to --

5    they are basically saying you should have known from looking

6    at this.  You should have gone down and looked at this thing

7    when it came in or the manager should have reviewed -- I

8    don't know if the manager reviewed any of this stuff.  The

9    bill comes in.  There is a clerk that handles that.

10        THE COURT:  Right.  One of the things they raise

11   is that there is a line, apparently, in the invoice -- even

12   though they go out on the LSM name or the Little i name --

13   that says that Webb Candy accepts Visa and Mastercard.  I

14   assume that managers aren't cutting the checks on these.  I

15   assume the invoices go to a bookkeeper in the back who cuts

16   the checks.

17        MR. SNYDER:  That's right.  And I don't know that

18   that knowledge of a bookkeeper is going to be all that

19   significant, even if they read that far.  Again, what does

20   it really say?  The invoice says Licensed Sports Marketing.

21   So Webb Candy takes Visa, what does that tell anybody?

22        THE COURT:  It would be confusing, if nothing

23   else.  I guess if I was a bookkeeper, I might think that LSM

24   copied this invoice from somewhere and forgot to take out

25   Webb Candy's name.  But it would be ambiguous at best.

1          MR. SNYDER:  Plus that undercuts the argument that

2     we're doing business with LSM.  I mean, it's pretty clearly

3     that this is coming from Webb Candy, and Webb Candy is going

4     to be ultimately receiving the payment on this.

5          THE COURT:  But most of the invoices -- I mean, if

6     you look at an invoice, you would think you were being

7     invoiced by LSM.  You wouldn't think you were being invoiced

8     by -- in fact, your fraud claim depends in part upon the

9     fact the invoice coming from LSM is leading them to believe

10    that LSM is actually doing it.

11         MR. SNYDER:  If it said Webb Candy on it, we

12    couldn't pay them.  It wouldn't be able to be paid.

13         THE COURT:  Let me ask you about this November

14    4th, 2008 e-mail from Alan Webb to Seth Malley.

15         I certainly agree with you that the notion that

16    this e-mail tells Malley "exactly what it was doing" is

17    ridiculous.  It doesn't tell Malley exactly what they were

18    doing.  Exactly what it's doing is we're selling and we're

19    paying so and so to use their number, and it doesn't say

20    that.

21         At the summary judgment stage, I have to take all

22    inferences in favor of the non-moving party, and I have to

23    look at how a jury could read this, even if this isn't the

24    way I would read this.  Is there not enough in here that a

25    jury could think that, at a minimum, Webb is telling Malley

1    that Webb Candy is selling its products essentially to

2    Wal-Mart stores, putting a million of its products in

3    Wal-Mart stores?

4         MR. SNYDER:  That question is what prompted me to

5    try to put this onto a timeline to explain it, because at

6    the time that that e-mail is issued, there is no more sales

7    going on to Little i.  Those are in the past.  So this does

8    not provide notice to Wal-Mart that Little i -- or someone

9    is using Little i's name and number on sales.  Those have

10   happened in the past.

11        The contracts that they are really going to be

12   trying to get the jury to enforce in this case are going to

13   be all Licensed Sports Marketing, I believe.  It's not

14   exactly clear which ones they have now taken off of their

15   list, but I believe that they are going to be all Licensed

16   Sports Marketing invoices.

17        THE COURT:  So there may be a stray contract here

18   or two, but your belief is that essentially Wal-Mart has

19   basically paid for -- all the Little i invoices have been

20   paid?

21        MR. SNYDER:  I believe that's the case, Your

22   Honor.  Now, they have said that they haven't been paid, but

23   that was, apparently, based on the fact that they didn't get

24   paid by their partner here.  So it's the Licensed Sports

25   Marketing sales that are going to be going to a jury.  The

e-mail doesn't say anything about Licensed Sports Marketing,
the sales that have been going on, by that point, for over a
month and continued until January 15th, which is the last
order date that we have on any invoices.  And, you know,
it's five days later they tell us about Licensed Sports
Marketing.  Well, we have been selling.  All throughout this
period of time, you know, in November and December there is
some investigation going on about some of these Little i
sales and they're not telling us.  That's the tip of the
iceberg.  We're really selling under Licensed Sports
Marketing, they never say that.  So they are continuing to
conceal this throughout this whole process.

THE COURT:  Okay.  They say in their briefs at a
couple of points that -- at one point I wrote it down in my
notes, "Alan Webb notified Wal-Mart that it was working with
LSM."  Your position is that was on January 20th of 2009.
And you had no hint of any involvement with LSM before that?

MR. SNYDER:  Yeah.  That's the record citation
that they provide.  If you look at what they cite as support
for that statement, it's January 20 th, 2009.

THE COURT:  And they also say, "Larry Wilhelm, the
former owner of LSM, also notified Wal-Mart that it was
working with Webb Candy."  Your view is that, to the
contrary, he testified he never mentioned Webb Candy to
Wal-Mart, all he did was set up this -- it's referred to as

1    a lockbox.  I take it he set up an account at a bank and he

2    told Wal-Mart to direct deposit his checks to that?

3            MR. SNYDER:  Instead of sending it to our home

4    office, please send our checks to a lockbox, which is

5    something that happens --

6            THE COURT:  The words "Webb Candy" never came up

7    in connection with any of that?

8            MR. SNYDER:  No.  No.

9            THE COURT:  I just wanted to verify that.

10           On the ratification argument that Webb Candy

11   makes, they cite Minnesota authority that I have run across

12   before that talks about that if you accept and retain the

13   benefits of a fraudulently-induced contract that you ratify

14   it.  And this is this head scratcher I have in this case

15   where we typically don't have fraud victims who profited

16   from being defrauded.

17           How do you get both to keep the profits and void

18   the contracts?

19           MR. SNYDER:  I don't know any reason we would have

20   to pay the profits back to them.  They are not entitled --

21           THE COURT:  It seems outrageous that they would

22   get it, too.

23           Did you run across in your research any situations

24   like this where we have a victim of fraud who was not

25   financially hurt in the slightest by being defrauded, who in

1       fact profited off the fraudulently-induced contract, who was

2       seeking to keep the profits they have earned off the

3       fraudulently-induced contract and then basically return, for

4       example, unsold merchandise?  Anything even close to our

5       situation?

6              MR. SNYDER:  I don't think there is anything I

7       have seen that is really on point.  I mean, there is a lot

8       of law in the real estate area where someone has been living

9       on the land and maybe profiting from their use of the land

10      and then realizes that I have been --

11             THE COURT:  You cited to me like the tenant who

12      plants the crop.  But this is different, though, in that

13      this is a fraudulent inducement of contract claim.  I mean,

14      you got sued.  You are not suing.  I understand that.

15      Essentially your defense is this contract is voidable

16      because we were fraudulently induced to enter in this

17      contract.  Now, we made a million bucks off the contract.

18      We're going to keep that.

19             MR. SNYDER:  It's not one contract.  It's 900

20      contracts.

21             THE COURT:  Right.  But just for ease of -- it's

22      hundreds of contracts, I understand that.  But, you know,

23      we, as Wal-Mart, made a lot of money off of these

24      fraudulently-induced contracts or we made money off of some

25      of them, but now we want to void others of them.  It comes

1    in both ratification where you want to keep the money you

2    made off of some of the fraudulently-induced contracts and

3    it comes up in recission.

4          Recission almost always is when you have a victim

5    of fraud they have been hurt.  And what we use recission to

6    do is to get them back where they were before they were

7    hurt.

8          MR. SNYDER:  Well, that's often the case, but it's

9    not always the case.  We cited the case -- actually, the

10    other side cited the case where the party actually did

11    better, *Kirby v. Dean.*  And they went to buy some insurance

12    policies and they were told that these policies will have a

13    certain value at year 15 and that was not the case.  They

14    actually were going to have a better value than that.  But

15    it was a fraudulent statement and provided a basis to

16    rescind even though they hadn't been damaged.  So there is

17    no requirement of damage to rescind the contract.  If it's

18    not --

19          THE COURT:  Yeah, but by rescinding the contract

20    they put the "victim" back to where he or she was before

21    they were fraudulently induced to buy this insurance.

22          MR. SNYDER:  Well, like in the life insurance

23    example, you get a year into it and now you are going to

24    rescind where you have had a benefit of a year worth of

25    coverage and there is a cost of insurance.  I mean, you have

1    to provide that back as part of the restitution.

2              THE COURT:  You didn't die during the year, so it

3    was no --

4              MR. SNYDER:  Right, but there is some value to

5    being insured.  So if you are going to rescind, you are

6    going to have to pay the premiums that were due during that

7    period of time, for example.  And the insurance company is

8    going to keep those because it did provide insurance for a

9    particular period of time.

10             So the idea is to put the parties back in the

11   position that they would have been in before the contracts

12   got entered.  That doesn't require anything to do with

13   profits at all.  What it requires is that you give them back

14   what you got, which is what we're trying to do with these

15   returns we want to give them.  We have already returned

16   some.  We want to return a whole bunch more as soon as they

17   accept to take it or accept it.  And we also then -- for the

18   things that we can't return to them, we would have to give

19   them some value for that.  And the value of that is the

20   contract price for it.  So what we can't give back to them

21   -- we have to put them in the same position that they would

22   have been in.  And that gets accomplished here through the

23   recission.  They get to keep all the money.  If we had

24   overpaid, we could try to get that back.  We could try to

25   get it back in any event, I think.  But they are back in the

1    same position that they would have been in had there been no

2    contract.  So they are not out of pocket anything at the end

3    of this if we void these contracts.

4           Yes, Wal-Mart has some money in its pocket because

5    of this, but that doesn't affect the right of recission.

6    I'm not aware of any cases that say it would.

7           THE COURT:  What about the ratification cases, the

8    ones that hold that when you accept and retain the benefits

9    from a contract, you can't void the contract?  Haven't you

10   accepted and retained the benefits from this

11   fraudulently-induced contract?

12          MR. SNYDER:  Have we accepted -- I mean, the cases

13   that they cite are --

14          THE COURT:  I don't know how you say it, *Proulx*

15   cases.  There is one that always gets cited.

16          MR. SNYDER:  Five-year gas station lease, a year

17   into it you find out you have been defrauded, you keep it in

18   place another year and get paid a salary by the oil company

19   during that period of time.  That's the case that they are

20   relying on.  It's nothing like what we have here.  That

21   person made a conscious decision that, oh, I want to keep

22   going with it.  Even though I know that this contract is not

23   what it was represented to be, I'm going to keep going with

24   it.  I don't think we have that.

25          THE COURT:  Is there even a part of this case,

though, that's a little bit like that *Proulx* case?  Like,
for example, you say that you find out about the LSM fraud
on January 20th.  It isn't until February, I forget the
date, 9th, something like that, that notification goes out
to the stores.  And even then the notification is you can
keep selling this stuff if you want or if you wish, you can
return it.  Isn't that a lot like the *Proulx* case where you
are continuing to take the benefits of what you have -- you
have Wal-Mart corporate now indisputably realizing the fraud
and it doesn't issue a pull order on January 21st.  When it
gets around to talking to the stores -- and I realize you
have to have some time to think, but when it does contact
the stores in early February, it isn't pull the stuff.  It
isn't return the stuff.  It's up to you, you can keep
selling it or you can pull it or you can return it.

          MR. SNYDER:  At that time, that was the message.
And in response to that over $300,000 of product was
returned.  That process got cut off when they said we're not
going to take these returns anymore.

          THE COURT:  Let's think of these as individual
contracts.  If some store in wherever, in Indiana, got that
message from Mr. Malley and said these things are moving
pretty well, we will keep selling them and next week they
keep selling lip balms, isn't that exactly the *Proulx* case?
Isn't that ratification?

1          MR. SNYDER:  Well, I don't know that we have

2    evidence that that's what happened.  We had a return process

3    going on that was ended by Webb Candy.  So I don't know if

4    that Indiana store --

5          THE COURT:  Well, you're saying we don't think

6    that a single lip balm was sold after February 9th by any

7    store?

8          MR. SNYDER:  Oh, I'm sure it probably was.

9          THE COURT:  And wouldn't those sales be accepting

10   the benefits of fraudulent contracts?

11         MR. SNYDER:  Then if they hadn't returned it by

12   that point in time for an individual lip balm, that's true;

13   not for the whole lot.  I mean, at some point we're

14   returning that whole lot.  And in March we're telling the

15   stores to pull that whole lot.

16         THE COURT:  Is it fair to assume just from roughly

17   speaking that e-mail -- did I get the date right or am I

18   close on the date?  February 9th, yeah.  So February 9th

19   this message goes out from Malley.  He tells the stores to

20   return by the 28th.

21         When does Webb Candy say they are not taking back

22   their stuff anymore?  What's the date of that?

23         MR. SNYDER:  The 24th.

24         THE COURT:  The 24th.  So is it fair to assume

25   then that about 300 and some thousand dollars of stuff was

1    sent back to them between February 9th and February 24th or

2    so and that another $300,000 was -- do we know of -- I'm

3    asking this very badly.  I'm sorry.

4         I'm trying to figure out do we know roughly how

5    much store managers were happy to keep on their shelves and

6    did keep on their shelves until the pull order came in March

7    versus material that you did want to send back to Webb Candy

8    but you couldn't because they refused to take it?  In other

9    words, of the 300 and whatever thousand is sitting in your

10   warehouse, how much of that is stuff in your warehouse

11   because you pulled it in March versus stuff that, say, on

12   February 25th was attempted to be returned and rejected?  Do

13   you have any sense of that?

14        MR. SNYDER:  No, I don't, Your Honor.  The time

15   period isn't that long really.  The 24th they sent this --

16   there was a little tiff going on between someone at Wal-Mart

17   and Mr. Webb, and Kim Carter at Wal-Mart was saying you need

18   to be more proactive in getting this stuff out of the

19   stores.  You sold this stuff to them.  You contact them,

20   make sure it comes back.  He said I don't have time to do

21   that.

22        THE COURT:  Webb Candy says that conversation

23   doesn't occur until March.

24        MR. SNYDER:  No, that conversation was in February

25   -- well, the conversation was earlier, but the e-mail chain

1    is --

2           THE COURT:  I could be getting this wrong, but my

3    recollection was in the reply brief they say -- that Webb

4    said that conversation occurred in person at a meeting that

5    took place in March, so that he denies that Carter told him

6    he needs to clear the stuff out of there before March.

7           MR. SNYDER:  Document 36-24 is the e-mail that I

8    am referring to that discusses that.

9           THE COURT:  What's the date of the e-mail?

10           MR. SNYDER:  The 24th of February.

11           THE COURT:  24th of February, okay.

12           MR. SNYDER:  Yep.  And earlier there is testimony

13    from her that when they are -- back through November that

14    they had a conversation when they were talking about --

15    November or December, I should say, when they were talking

16    about the Little i situation and she told him you can't sell

17    products to a store using someone else's number.  And that's

18    in the record back then.

19           THE COURT:  There is this quote from her that gets

20    cited a lot in the briefs about telling Mr. Webb to get his

21    stuff out of the stores.  When does she say she told him to

22    get his stuff out of the stores?

23           MR. SNYDER:  I think she was talking to him about

24    those sorts of things throughout the process.  I don't think

25    she pinned it down to a particular date.

1          THE COURT:  There is a difference in saying you

2    can't do this and saying now you go back to the stores you

3    did this in and get your stuff out of there.  Does she in

4    her testimony distinguish between the two?

5          MR. SNYDER:  No.  I think this is really coming up

6    after January 20th, if I can put those sort of time brackets

7    around it.  That's when they provided the UPC numbers and

8    Seth Malley said now we have understood, now we can look at

9    some records and figure out what it is that has gone through

10    the Wal-Mart system and see how many stores have actually

11    been sold to.  That's when they come up to this huge number

12    of stores that have been sold to.  They didn't understand

13    that before.  You know, that's when the matter really became

14    more serious, and these ongoing discussions and Mr. Webb is

15    saying, well, don't kill my business.  Seth Malley is

16    saying, well, I've got to --

17          THE COURT:  I realize that, at least according to

18    his testimony, this message that goes out on February 9th,

19    which kind of gives stores the option to return it, he is

20    trying to be nice to Mr. Webb.  Sometimes it doesn't pay to

21    be nice.  This is something that is going to hurt you in

22    this lawsuit or could hurt you in this lawsuit.  So I

23    understand, though, he had good motives in what he did.

24    That point is clear.

25          MR. SNYDER:  The end point, we're in March, and

1   they have had a meeting now and everything is crystal clear.

2   They are not going to accept anything further, and we're

3   pulling everything off the shelves and shipping it to a

4   distribution center.

5           THE COURT:  Let me just ask you one question about

6   the perfect tender rule and that's that the goods -- one of

7   the requirements is that the goods didn't conform.  You say

8   that the reason they didn't conform is because they were

9   supposed to be coming from LSM and they were coming from

10  Webb Candy.  And I don't remember if you just cited a case

11  that hits this right on point.  I just want to make sure if

12  you are aware of law that says this directly on point, which

13  is for purposes of this provision of the UCC 2-601 that if I

14  order goods and the goods I get -- the lip balm I get is

15  precisely the lip balm I ordered in all respects except that

16  it was really being supplied by X when I thought it was

17  going to be supplied by Y, that that is a non-conforming

18  good for purposes of 2-601.  Are there cases directly on

19  point that say that?

20          MR. SNYDER:  For the rejection issue?  Because it

21  is for revocation, I think, for sure.  I think maybe there

22  is a --

23          THE COURT:  Well, I mean for -- well, we're going

24  to get to the -- there is a similar issue that comes up

25  under the revocation of -- where the phrase is different.

1    Let me just find it.  It's non-conforming in a way that

2    costs you money.  The value is substantially impaired.  And

3    I know you cited cases there about your faith being shaken

4    because you found out the seller isn't who you thought.

5         But under the perfect tender rule are you aware of

6    cases that says that, for example, lip balm that is

7    precisely the lip balm that you thought you were buying that

8    it doesn't "conform to the contract" just because it wasn't

9    supplied by the person you thought who was supplying it?

10        MR. SNYDER:  I don't think I cited a case that

11   deals with that specific issue.  It's material, and we cited

12   cases that --

13        THE COURT:  Right, you cited materiality cases.

14        MR. SNYDER:  Right.

15        THE COURT:  The same point now on 2-608, which is

16   the revocation of acceptance.  Without reading any of the

17   cases -- when I read that the value of the product has to

18   have been substantially impaired, I would think that this

19   kind of situation wouldn't fit because the lip balms aren't

20   worth any less.  The value of the product isn't

21   substantially impaired.  The lip balms weren't worth any

22   less because they were sent by Webb Candy rather than LSM.

23   You cite cases using phrases like it shakes the buyer's

24   faith and the integrity of the product, faith is shaken in a

25   major investment, buyer becomes fraught with apprehension.

1   It seems almost a little silly to be using those terms when

2   we're talking about a supplier of lip balm, a supplier of

3   lip balm to a multi-billion dollar company.

4           Is there any sense in those cases that -- I don't

5   know quite how to ask this.  Do the cases say that a mistake

6   as to the identity of the buyer automatically impairs the

7   value of the goods or it could impair the value of the goods

8   and that's something that a jury would generally decide?

9           MR. SNYDER:  I think it could vary.  It's not

10  simply, you know, the product -- well, in certain

11  circumstances you could have a commodity that is a commodity

12  that's the same no matter who supplies it, corn or something

13  like that.  And it doesn't matter if someone says I'm Acme

14  Corn Company and they are not.  It's not going to probably

15  be that significant.  It probably is not a basis to reject

16  it if the corn itself is okay.

17          But these products have with them other

18  components, not just the product.  It's product liability

19  insurance, the testing of the product, the financial

20  wherewithal of the supplier, whether they are violating

21  someone else's trademark rights.  All these things are kind

22  of pulled together into the product that's being sold and

23  that's the stuff.  It's probably not so much the defect with

24  the lip balm itself.  All those other things are missing

25  here.  That's what's shaking the faith under this objective

1    standard, that we just don't know -- we have rejected this

2    company before and now they are lying to us.  Why would we

3    want to do business?  Why is that not an important

4    consideration in considering whether we want to void our

5    acceptance of the goods?

6              THE COURT:  I mean, just the conceptual problem

7    I'm having with that argument is that it seems to me at the

8    end of the day you ended up with a contract with LSM that

9    had the obligation to have the product-liability insurance

10   and all those sorts of things.

11             MR. SNYDER:  I don't know that that's the case.

12             THE COURT:  Well, you said you agreed with me an

13   hour ago.  Which part is the case, that you had a contract

14   with LSM?

15             MR. SNYDER:  That all the components that Wal-Mart

16   was looking for are present.

17             THE COURT:  I don't know whether LSM had them or

18   not, but the premise of your argument in your brief is that

19   our managers thought they were entering into a contract with

20   LSM, and they were in fact entering in a contract with Webb

21   Candy.  My point is that isn't true, they were entering into

22   a contract with LSM.  So if there is some fraud there, it

23   isn't in the identity of the contracting party because they

24   are contracting with exactly who they were led to believe

25   they were contracting with, it seems to me.  So it has to be

1  some other sort of fraud.  It's hard for me on -- if I'm

2  right about that or whether I'm right or not, if it's what I

3  believe, it's hard to know what to do with a summary

4  judgment motion that's centered on the fact that you led us

5  to believe that we were contracting with LSM when we were

6  contracting with Webb Candy when I don't think you were

7  contracting with Webb Candy.  I think you did contract with

8  LSM.  So if there is fraud, it's a different sort of fraud

9  than is being presented in the motion for summary judgment.

10  That's the thing I'm getting stuck on.

11      MR. SNYDER:  Well, the analogy that someone told

12  me -- and if it bombs, I will blame this other person -- you

13  go into a McDonald's and you misrepresent who you are, I

14  want to order lunch and my name is John Smith and it's not,

15  they don't care.  It doesn't matter.  That's not a material

16  part of this.  But if you go into the store that has the

17  golden arches and says "McDonald's" on the front and you go

18  up and order your lunch and it's not a McDonald's store,

19  it's somebody else's store that's purporting to be

20  McDonald's, that's material to you because you don't know

21  who -- you know who McDonald's is.  You have eaten there a

22  bunch of times before perhaps.  But you don't know who this

23  imposter is.  That's why it's material.

24      THE COURT:  Here's the problem with the analogy --

25  you go back and yell at the person who gave it to you -- is,

A, you ended up getting a McDonald's hamburger.  You got exactly the hamburger you thought you were buying, and it was just as delicious as you wanted it to be and later on you found out it wasn't a McDonald's hamburger, even though you couldn't tell the difference when you were eating it.

And, B, your contract actually wasn't with McDonald's, meaning that if you didn't get what you'd ordered from McDonald's, you had a right to sue McDonald's.

MR. SNYDER:  But McDonald's couldn't compel me -- after I find out that that sandwich was not a McDonald's sandwich, they can't compel me to pay for it, I don't think.  That's the whole point here.  What they are trying to do is compel me to pay for something that I didn't actually bargain for.

THE COURT:  We're going to probably strangle ourselves in this analogy here.  But where have you been harmed?  Your contract was with McDonald's, and you got exactly what you thought you were going to get from McDonald's in terms of the product itself.  Where is the daylight there?  Where is the --

MR. SNYDER:  I don't have to be harmed.  I don't have confidence that they are using beef that has been inspected; I know McDonald's does because that's what McDonald's does.  I don't know what this imposter is doing.  I don't know if this lip balm from a source in China has

1  lead in it or something else that a lot of products from

2  China have in it.  It has never been tested.

3       I can't be compelled to buy that stuff, is what my

4  argument is in this case.  That's what they are trying to do

5  in this case, they are trying to compel me to buy something

6  that they misrepresented to me.

7       THE COURT:  Okay.  Let me talk to Mr. Moore.

8       What I will do is let's just take about a

9  10-minute break so that Deb can have a chance to stretch,

10  and then I will come back and talk to Mr. Moore.

11       THE CLERK:  All rise.

12       (A brief recess was taken.)

13       THE CLERK:  All rise.

14       THE COURT:  Please be seated.

15       All right.  Mr. Moore, if I could talk to you,

16  please.  So, Mr. Moore, I'm finding myself asking questions

17  about the case that weren't really in the briefs.  You know,

18  the main fraud claim against your client is when they were

19  out there and they were -- as it's briefed and when they

20  were out there, they were calling these stores and they were

21  saying they were with Little i or they were with Little m

22  (sic), they were lying.  The result of it is that they were

23  tricking Wal-Mart into thinking they were entering into

24  contracts with LSM or Little i when in fact they were not.

25  And my reaction to that is exactly what they were doing:

1    They were entering into contracts with LSM and Little i, so

2    there is no fraud.  But you never say that anywhere in your

3    briefs.  It means I'm really wrong or it didn't occur to

4    you.  Do you disagree with me?  Do you think, in fact, Webb

5    Candy has contracts with all these people?  I guess you do

6    because you brought a breach of contract.  How does Webb

7    Candy have contracts with these people?

8              MR. MOORE:  Your Honor, I don't disagree with you

9    on that issue.  I didn't put it that clearly in the brief,

10   but what I argued is that the orders and the invoices are

11   the contracts and those invoices are Licensed Sports

12   Marketing.

13             THE COURT:  But then doesn't that mean that I have

14   to dismiss the contract claim in this case insofar as it's

15   brought by Webb Candy?  It would allow LSM to pursue

16   contract claims but not Webb Candy.

17             MR. MOORE:  That would be the extreme, yes, Your

18   Honor.

19             THE COURT:  Or we would call it the logical

20   implication.

21             MR. MOORE:  Right.

22             THE COURT:  One or the other.

23             MR. MOORE:  Right.  As Mr. Snyder mentioned, we

24   have the quantum meruit unjust enrichment claim, and that

25   would come into play if there were no contracts.

1          THE COURT:  I don't know what Webb Candy could do,

2     but if I'm right about that, that these contracts are

3     contracts between LSM and Wal-Mart, then the fraud that's

4     put forth in the briefs at least didn't exist because the

5     Wal-Mart managers were contracting with exactly who they

6     thought they were contracting with.

7          Now, Mr. Snyder had suggested today a claim that,

8     well, even if they were contracting with who they thought

9     they were contracting with, because of the way Wal-Mart

10     works, they would have assumed the product they were buying

11     was vetted and approved by a Wal-Mart buyer and that that

12     could have been the fraud, but that's not what's briefed.  I

13     mean, that's not -- I can only rule on what's briefed.  So

14     that would mean -- if I'm right about this, that would mean

15     two things -- that is, the breach-of-contract claim would be

16     LSM's in this case, not Webb Candy's; although, you may have

17     a quantum meruit case; and also that no one could bring

18     Little i-related claims because Little i isn't in the case.

19          MR. MOORE:  You are correct, Your Honor.  You

20     asked Mr. Snyder this, and I believe that all of the

21     payments at this point that the plaintiffs are seeking are

22     LSM invoices at this point in time.  Through the discovery

23     originally our claims were for $650,000, as I explained in

24     the brief.

25          THE COURT:  Right.  You discovered you got ripped

1     off by Little i perhaps and so to the extent you have unpaid

2     Little i invoices, that seems to be because of what Little i

3     did, not because of what Wal-Mart did.

4           MR. MOORE:  That's what it appears to be.  Yes,

5     Your Honor.

6           THE COURT:  So we have a case here, as far as you

7     know, entirely made up of LSM invoices?

8           MR. MOORE:  Right.

9           THE COURT:  All right.

10          MR. MOORE:  There may be a few stragglers in

11    there, but for the most part, LSM.

12          THE COURT:  You sort of in your brief nod to this,

13    but it's never really explained.  Was there any difference

14    between your relationship -- let me ask you to clear up this

15    one thing about the timing, first of all.  I understood from

16    everybody's briefs that you had a deal with Little i, and

17    then on November 25th you replaced it with a deal with LSM.

18          Now, for the first time today, at least this is

19    the first time I understood it, Mr. Snyder says, no, you

20    were selling under both names from the beginning.  Help me

21    with this.

22          MR. MOORE:  Your Honor, when I looked at those,

23    and listening to Mr. Snyder's argument -- and you asked

24    Mr. Snyder how would the salesperson know who to say he is

25    with, either Little i or LSM.  When Webb is paying Little i

1     five percent and LSM three percent, wouldn't it be better to

2     be from LSM.  And if you look at the two invoices that

3     Mr. Snyder provided to the Court today, the LSM one, the

4     salesperson is Tom Easterly on September 29th.  The Little i

5     one is also Tom Easterly on the same day.  So, Your Honor, I

6     don't know the answer, but I would say that that's a mistake

7     on the invoice myself.  But I don't know the answer to the

8     question.

9           THE COURT:  Mr. Snyder says there is a steady

10    stream of these throughout the end of September and into

11    October.

12          MR. MOORE:  I would have to go back -- I'm sorry.

13          THE COURT:  If what you have told me is true --

14    I'm not suggesting you are lying.  I'm suggesting there may

15    be a mistake here.  If what you told me is true, then we

16    shouldn't have any LSM invoices, invoices going out from

17    LSM, until something like November 25th or 26th.

18          MR. MOORE:  The formal agreement was end of

19    November of '08.

20          THE COURT:  And what about an informal agreement?

21          MR. MOORE:  Your Honor, I don't know the answer to

22    that.  I know there was some overlap between LSM and

23    Little i.  And I thought it happened -- if memory serves me

24    correctly, it was around the end of October, beginning of

25    November time frame.

1          THE COURT:  I understand that witnesses get fuzzy

2     about dates, but you'd think that if Webb Candy was using

3     both numbers from the beginning, they would remember that,

4     for one thing, because, as I've talked about, the

5     salespeople would have had some way of knowing who they were

6     saying they were with when they were making these calls.

7          Were these cold calls, I assume, mostly?

8          MR. MOORE:  They were, Your Honor.  The

9     salespeople did testify, they said when they were with

10     Little i, they said I'm so and so with Little i.  Then when

11     they went to LSM, they said I'm so and so with LSM.

12          THE COURT:  That's just odd, though, because --

13     I'm really having trouble just reconciling all this.  That's

14     what I read in the briefs.  It sounded like the salespeople

15     themselves thought there was a time they were with Little i

16     and there was a time they were with LSM and the one followed

17     the other.  But Mr. Snyder presents these invoices that have

18     people making sales on the same day in September under both.

19     So it's just a head scratcher.

20          Was there a difference between the relationship

21     between Webb Candy and Little i on the one hand and Webb

22     Candy and LSM on the other hand?

23          MR. MOORE:  Yes, there was.

24          THE COURT:  What was the difference?

25          MR. MOORE:  The difference, besides the dollar

1    amounts --

2            THE COURT:  Right, I know the commissions were

3    different.

4            MR. MOORE:  Little i was going to do all of the

5    financial transactions with Wal-Mart.  In other words,

6    Wal-Mart would pay it to the Little i bank account.

7    Little i then would do a reconciliation, send it back to

8    Webb Candy.

9            With Licensed Sports Marketing they opened up this

10   joint lockbox account.

11           THE COURT:  Right.

12           MR. MOORE:  And they both had access to that

13   account, both Webb Candy and Licensed Sports Marketing.  And

14   more so, and I think this is the most important thing that

15   leads to the joint venture, is Wal-Mart has -- and I don't

16   know what they call it, but you can tap into their system if

17   you are a vendor and see where your payments are lining up

18   and when they are going to come.  Little Sports Marketing

19   (sic) did not allow Webb Candy to view that.

20           THE COURT:  Little i you mean?

21           MR. MOORE:  Little i, yes.  I'm sorry.  Licensed

22   Sports Marketing did.  They shared that information.  They

23   allowed Webb Candy to get on that system with them.

24           THE COURT:  Well, we now have some reason to know

25   why Little i wasn't letting Webb Candy onto it.

1          MR. MOORE:  That very well could be.

2          THE COURT:  But was there a difference in terms of

3    -- I mean, there was some suggestion in the briefs that this

4    joint venture was supposed to include Webb Candy's

5    salespeople trying to push LSM products as well as Webb

6    Candy's products.

7          MR. MOORE:  Right.

8          THE COURT:  Is there evidence that they actually

9    did that?

10          MR. MOORE:  Well, there is evidence -- I don't

11   know if it's in the record, Your Honor, but what Licensed

12   Sports Marketing did have for product was college lip balms,

13   so University of Kentucky, for example.  And those products

14   were products that Webb was going to sell if they could.  I

15   don't know if they did sell any.  I do know -- I have seen

16   them in the warehouse.  There are boxes of them.

17          THE COURT:  But there is no evidence in the record

18   that the Webb Candy employees ever sold any LSM products?

19          MR. MOORE:  Right.  Now, they had the opportunity

20   to and the right to, but --

21          THE COURT:  Do we know if they ever tried to sell

22   LSM products?  Is there evidence in the record?

23          MR. MOORE:  There is nothing in the record that I

24   am aware of.

25          THE COURT:  When, in your view, does Wal-Mart

1    first -- you rely a lot upon this November 4th e-mail.  But

2    the November 4th e-mail to Mr. Malley doesn't say a word

3    about Licensed Sports Marketing.

4            MR. MOORE:  Correct.

5            THE COURT:  When, in your view, does Wal-Mart

6    first -- obviously, they agree that they are informed of it

7    on January 20th.  When, in your view, are they informed of

8    the relationship between LSM and Webb Candy?

9            MR. MOORE:  Your Honor, I don't have any evidence

10   to the contrary of January 20th --

11           THE COURT:  Okay.

12           MR. MOORE:  -- other than the fact that when the

13   invoices are coming in, when the orders are coming in under

14   Licensed Sports Marketing, you know, the products shows up

15   and it's Webb Candy.  As you mentioned, the label says

16   distributed by.

17           THE COURT:  The problem with that argument,

18   though, it gets you only part of the way, which is this

19   stuff doesn't happen until the order has already been

20   placed.  So it's not a -- if you need to argue that you

21   should have realized when our salesperson is talking to you

22   that they are really talking to you on behalf of Webb Candy,

23   not LSM, and the reason you should have known that is

24   because after you get the product if you look at it, you

25   will see it says Webb Candy on there, it doesn't work

1    because you don't get the product until you order the

2    product.

3              MR. MOORE:  Actually, we do, Your Honor, have

4    evidence in the record that the Apple Valley store called

5    back -- and after the transition from Little i to Licensed

6    Sports Marketing -- and purchased product from the reorder

7    from Webb under the Licensed Sports Marketing, so they would

8    know at that time.

9              THE COURT:  Yeah, but that's the Apple Valley

10   store.

11             I just lost my train of thought.  There was

12   something that you said that made me want to ask you a

13   question.  It will come back.

14             As I understand where Mr. Snyder left off with me

15   is on the issue of authority, that he says that store

16   managers have the authority to buy products directly from

17   vendors, but only from vendors with numbers, which we have

18   all agreed on from the beginning, and only products that

19   have been approved by Wal-Mart corporate.  Now, that's where

20   you disagree; is that correct?

21             MR. MOORE:  That's a new argument, Your Honor,

22   that has never been put forward that I can tell in this

23   case.

24             And Mr. Wilhelm, the Licensed Sports Marketing

25   owner, testified that that Supplier Agreement or that vendor

1    agreement, it's not product specific.  It's just here, you

2    are now an approved vendor.

3           And the way Wal-Mart -- to me the way they argued

4    it was Wal-Mart now trusts that vendor.  And it's not

5    necessarily that they go out and they vet every product that

6    that vendor has, but they trust that vendor to be a decent

7    supplier, to go vet the products for themselves that they

8    are going to sell to Wal-Mart.  And if that weren't the

9    case, Your Honor, I would think you would have addendums to

10   that Supplier Agreement every time that vendor tried to

11   introduce a new product.

12          THE COURT:  I mean, some of these vendors, I would

13   think they would have a constantly shifting array of

14   products they are offering.

15          MR. MOORE:  Absolutely.

16          THE COURT:  I certainly understand when the

17   products are coming to the distribution center, obviously, a

18   buyer at Wal-Mart is buying them.  Somebody has to buy them

19   from the distribution center.

20          Didn't you quote something, I don't remember if it

21   was in a Wal-Mart U handbook or what it was that,

22   specifically talked about postcards and --

23          MR. MOORE:  School imprint items.  That's in the

24   Wal-Mart University document about 70-type.

25          THE COURT:  Okay.  I couldn't follow what

1    Mr. Malley and the investigator whose name I'm forgetting --

2    and I know you cited testimony from them that said they

3    don't know what they are talking about or they are not very

4    familiar with the 70-type, but what do you understand the

5    70-type ordering to be and what they were -- I just didn't

6    understand what they were saying.  They were saying this

7    isn't a buying mechanism, it's a something mechanism.

8        MR. MOORE:  Yeah, I didn't understand it either,

9    Your Honor.  What our clients were under the impression of

10   when they got this from Luke, the manager of the Apple

11   Valley store, when they went in on that initial meeting,

12   Luke said I can buy the product and it goes through this

13   70-type procedure, and he explained that 70-type procedure

14   to our clients.  And that's how they understood that the

15   products got ordered at the store level, was through this

16   70-type procedure.

17       THE COURT:  Well, that's right, because he is --

18   and I know we're dealing with one guy at Apple Valley, but

19   he is saying to Webb Candy, who he knows doesn't have a

20   vendor ID number, that I can buy that product right there,

21   but I can only buy it if you get a vendor ID number.  He

22   didn't say if you get that product approved; although,

23   Mr. Snyder the way he describes it is it's almost as though

24   that -- its just odd because I haven't seen anywhere in the

25   record anything talking about a product ID number.  I have

1    only seen the vendor ID number.

2           MR. MOORE:  And, Your Honor, another thing is we

3    cited that testimony from Paul Henson where he called Seth

4    Malley about selling that at a national level, selling this

5    lip balm at a national level.  And he said, nope, that's a

6    local item, you go up to the local stores and deal with it.

7    We don't deal with that at corporate.  You can understand

8    logistically why they couldn't.  There are so many high

9    schools.

10          THE COURT:  Right, there are tens of thousands of

11   high schools and postcards and things like that.

12          And just to nail this down on the question of your

13   position on the misrepresentation, your position is there

14   was not a misrepresentation because when a Webb Candy

15   employee is calling on behalf of this joint effort between

16   LSM and Webb Candy and says they are with LSM, what they are

17   essentially doing is negotiating what's going to be a

18   contract between LSM and the Wal-Mart stores.  So the

19   Wal-Mart store is contracting with exactly who they think

20   they are contracting with; that Webb Candy is essentially

21   going to be fulfilling that order, it's going to be doing

22   the work, and it's going to get paid by LSM for doing the

23   work, but no lie has been told in this procedure, right?

24          MR. MOORE:  I would agree with Your Honor.

25          THE COURT:  Well, I was asking you if that's your

1    position, so you would have to agree with it.

2          MR. MOORE:  That is my position, yes.  They were

3    with Licensed Sports Marketing and earlier with Little i.

4          We put in the brief the way, you know, Licensed

5    Sports Marketing had always done business at Wal-Mart was

6    very similar.  They never had any employees, Licensed Sports

7    Marketing.  They were owned by two separate companies, and

8    those employees would call Wal-Mart and they would sell the

9    product to Wal-Mart through Little i.  Little i didn't

10   manufacture.

11         THE COURT:  The contract would be with Little i or

12   --

13         MR. MOORE:  I'm sorry, Licensed Sports Marketing.

14         THE COURT:  Well, let's say LSM.  The contract

15   would be with LSM, but LSM doesn't make anything.  LSM

16   doesn't have any employees.  It was one of the holding

17   company's employees that were actually negotiating it.

18         MR. MOORE:  Exactly.

19         THE COURT:  So it would be very similar.

20         And that would also go to your materiality

21   argument -- that is, if the managers knew that although they

22   had a contract with this vendor, LSM, that really there was

23   a -- they were sourcing it pretty much, that that wouldn't

24   startle or be material to the managers because it happens

25   all the time?

1        MR. MOORE:  It happens all the time.  We do have

2    testimony in the record that it happens all the time.

3    Wal-Mart, in fact, testified that they don't always buy from

4    the manufacturer of the product.

5        THE COURT:  Okay.

6        MR. MOORE:  Your Honor, also reliance -- there is

7    absolutely no evidence in this record that a store manager

8    ever felt he was duped or ever came in and said, you know, I

9    relied on that to our detriment.

10        THE COURT:  Well, it's one of the things -- I

11    think you are all going to have to try this case if you

12    can't settle it.  It's going to be one of the -- boy, it's

13    going to be really hard to know who the jury should cheer

14    for on this one.  You have somebody making a million dollars

15    off the deal complaining about the deal.  And we have your

16    client who were not being terribly forthcoming when they

17    were dealing with it.  Jurors may even conclude that they

18    were lying.  You know, it won't be an inspiring day to serve

19    on a jury, but if we have to try it we have to try it.

20        Let me ask you about the question of knowledge --

21    that is, whether these store managers should have known that

22    Webb Candy was basically, you know, doing 90 percent of

23    this, and although the contract was with LSM, it was Webb

24    Candy that was doing all the work behind the scenes and

25    that.

1      We have already talked about these things they

2  would know from after the product is delivered, but not only

3  would that be after the product is delivered, but there

4  wouldn't necessarily be anything startling about that in

5  that, as you said, it's not uncommon for licensed vendors to

6  sell products they have sourced elsewhere.  So if ABC

7  company is a licensed vendor and I buy whatever, toenail

8  clippers, from ABC company, the fact that they would have

9  Acme on them wouldn't startle me as a store manager because

10  a lot of people, I assume, are sourcing things from other

11  people.

12      So that wouldn't tell the store managers

13  necessarily that they are dealing with Webb Candy because

14  they could be dealing with LSM and LSM could be getting the

15  stuff from Webb Candy, right?

16      MR. MOORE:  What it would tell them is that

17  product is distributed by Webb Candy.  And I think that's

18  the crux of Wal-Mart's argument, is that somehow Webb Candy

19  supplied this product when they shouldn't have.  And I don't

20  see any support anywhere as to why Webb Candy couldn't

21  supply product through Licensed Sports Marketing or Little i

22  for that matter.

23      THE COURT:  Well, Webb Candy can't have direct

24  contracts with Wal-Mart stores because they are not

25  authorized to.  Mr. Webb knows that because he doesn't have

1    a licensed vendor number, he, Webb Candy, can't contract

2    with a Wal-Mart store to deliver stuff to a Wal-Mart store,

3    true?

4            MR. MOORE:  True.

5            THE COURT:  He needs to get a vendor to make the

6    contract, and then he needs to work through -- he basically

7    has to cycle his products through that vendor to Wal-Mart.

8            The risk for the vendor is that if Webb screws up,

9    Wal-Mart is going to hold LSM responsible.  LSM then could

10   turn and hold Webb Candy responsible essentially as its

11   supplier.  But that's putting LSM at legal risk because it's

12   the one who is going to be held responsible to Wal-Mart, but

13   in return it's getting its cut.  That's why it's taking its

14   cut.

15           MR. MOORE:  Right.  It's not as if Webb lied and

16   said we have a vendor ID number and here it is and made up

17   some vendor ID number.

18           THE COURT:  No, you negotiated contracts.  You

19   represented that you were acting on behalf of LSM,

20   negotiating contracts on behalf of LSM, and like I keep

21   saying, that's what came out of this, contracts with LSM.

22   If there was a screw-up here, Wal-Mart could have sued LSM,

23   and LSM could have sued Webb Candy.  I don't think Wal-Mart

24   would have had any right to sue Webb Candy, if I understand

25   all this correctly.

1          I'm just looking through my notes here.  We have

2     talked about a lot of this stuff, so I'm trying to skip over

3     things.

4          This e-mail on November 4th of 2008, although we

5     spend a lot of time on it in the briefs, ultimately if this

6     is all about LSM invoices are unpaid, it's sort of

7     irrelevant, this e-mail, isn't it?

8          MR. MOORE:  Except for the fact that they say

9     nobody knew Webb Candy was involved.  I mean, Wal-Mart knew

10    Webb Candy was involved.

11         THE COURT:  Was involved with Little i?

12         MR. MOORE:  Yeah.

13         THE COURT:  But there is no reason from the e-mail

14    that anybody would have known from Wal-Mart that they were

15    involved with Little i?

16         MR. MOORE:  Not at that point.  Not from that

17    e-mail, correct.

18         THE COURT:  All right.  You say in your brief, I

19    quoted this, "Alan Webb notified Wal-Mart that it was

20    working with LSM."  Now, I just wasn't sure what you were

21    referring to there.  But Mr. Snyder says that you were

22    referring there -- that if you trace back the cite to the

23    record, that's this January 20th of 2009.

24         MR. MOORE:  Correct.

25         THE COURT:  For our purposes today you are

1    conceding that you have no evidence that Wal-Mart was

2    informed that you were working with LSM prior to January

3    20th, 2009?

4          MR. MOORE:  Not that I can think of off the top of

5    my head, Your Honor.  I can go back and look.

6          THE COURT:  You also mention that Wilhelm notified

7    Wal-Mart that he was working with Webb Candy.  Is there any

8    reason -- Mr. Snyder says, no, he notified Wal-Mart to

9    direct its checks to an account, but there is nothing that

10    Wal-Mart would have known from that anything about Webb

11    Candy.

12          MR. MOORE:  Well, Your Honor, the account is a

13    joint account.  I would think --

14          THE COURT:  Does Wal-Mart know -- you know, my

15    wife's employer deposits her checks directly into our

16    account.  They just get an account number.  They don't know

17    who is on the account.  They don't know if I'm on the

18    account or anybody else is on the account.

19          Other than that presumption, do you have any

20    reason to believe that by getting this account number from

21    LSM that they would have known they were dealing with Webb

22    Candy?

23          MR. MOORE:  The other thing is Wal-Mart's payment

24    system, whatever that --

25          THE COURT:  How would it tell Wal-Mart Webb Candy

1    was involved?

2          MR. MOORE:  They have to get into the system.

3          THE COURT:  If I give you my password to get on to

4    whatever website, the Star Tribune's website, they don't

5    know it's you.  All they know is you are logging in under my

6    password.

7          MR. MOORE:  That could be.

8          THE COURT:  So you don't have any reason to know

9    that the operation of this joint account would have

10   necessarily told Wal-Mart that it was somehow dealing with

11   Webb Candy?

12         MR. MOORE:  I mean, I don't have any direct

13   evidence of that, Your Honor, no.

14         THE COURT:  Okay.  Well, Mr. Snyder also testified

15   that Mr. Wilhelm says that he did not notify -- I did not go

16   back and look at the transcript, but he did not tell

17   Wal-Mart anything about Webb Candy.

18         MR. MOORE:  The testimony is Mr. Snyder asked him

19   very specifically did you tell your buyer.  Larry Wilhelm

20   hadn't talked to his buyer for quite some time and he said

21   no.  So I think that's what Mr. Snyder is referring to.

22         THE COURT:  Your ratification argument, as I

23   understand it, is the same one I mentioned to Mr. Snyder,

24   which is Wal-Mart finds out of the arrangement between LSM

25   and Webb Candy on January 20th; that if there was anything

fraudulent about that, which you obviously dispute, they
know about it on January 20th.  From January 20th until
mid-March, there are at least numbers of stores that are
continuing to sell the Webb Candy product.  From the
corporate level there is nothing that comes from corporate
until three weeks later, February 9th.  And even then what
comes from corporate is keep selling them if you would like,
send them back if you'd like.  Corporate only pulls the plug
on them in the middle of March.  So that course of conduct
is ratification.  If you discover on January 20th you were
defrauded, then within a short period of time you need to
pull those products and get them all on trucks?

        MR. MOORE:  Your Honor, I would go back further
because even though it was with Little i, Wal-Mart knew of
Webb's involvement with these lip balms back in November.
And by not telling them back in November, even December stop
doing what you are doing, that's a ratification of the
contract, Your Honor.

        THE COURT:  Now, Mr. Snyder tells me that
Ms. Carter, was it, was an ongoing -- for these purposes I
have to take his version of the facts, that she says she was
in ongoing conversations with Mr. Webb telling him to stop
doing what he was doing.

        MR. MOORE:  Not to stop.  The first indication we
have to stop selling the product was from Seth Malley on

February, right before February 9th, right before his
announcement went out to the stores.  He testified that he
did not tell Webb Candy to stop doing this until that early
February date.  And knowing about it back in November, they
should have told them then, but they went along with it.

I think you hit it right on the head, they were
making a bunch of money off of this thing, so they kept it
in play.  They never told him to stop selling it.  The
testimony with Kim Carter or the conversations there about
getting it out of the store or you have got to pull your
product, that happened -- as we put in the briefs and in
Alan Webb's affidavit -- in that in-person conversation in
March.

Now, there is e-mail correspondence during this
February time frame when the announcement went out where
Alan Webb is telling Kim Carter -- or asking her to tell him
which stores he needs to contact.  And she says you sold it,
that's your problem.  But that's what's going on there.
They never told Webb Candy to stop until early February --

THE COURT:  Okay.

MR. MOORE:  -- and didn't tell them to physically
get it out of the stores until March.

THE COURT:  Well, they kept -- it appears -- and
Mr. Snyder doesn't deny that it probably happened, it
appears there were stores selling Webb Candy-supplied

1    product for several weeks after the February 9th notice went

2    out.

3            MR. MOORE:  Right.  And we actually put in our

4    brief, Your Honor, there was a store display down in a

5    Georgia store --

6            THE COURT:  Yeah, somebody called.

7            MR. MOORE:  -- in April.

8            THE COURT:  No organization as big as Wal-Mart is

9    going to be perfect.  If Wal-Mart on January 21st had sent

10   out a pull order pulling all materials and some manager in

11   some store in Georgia didn't pay attention to that, it

12   wouldn't bother me particularly.

13           But what I think is more significant is nothing

14   goes out until February 9th, and on February 9th what goes

15   out is keep selling it if you want, return it if you want.

16   So that, I think, makes a better case for you for

17   ratification.

18           MR. MOORE:  Yes, Your Honor.

19           And also with recission, if you are going to

20   rescind, you have to do it promptly.  You can't do it sort

21   of half-heartedly.  You have got to rescind the entire

22   thing, and they just didn't do that.

23           THE COURT:  If they had acted promptly and

24   rescinded the contract, what would that look like in your

25   view, that they would, what, have to send you a check not

1  just for -- they'd have to pay not just for the product they

2  sold, but they'd have to also give you the profits they made

3  on the product?

4        MR. MOORE:  Your Honor, you have two options when

5  you claim to be a victim of fraud:  One is to keep what you

6  receive and sue for damages.  That's one option.  But they

7  didn't take that option because, first of all, they weren't

8  damaged and they -- well, they weren't damaged.

9        The second option is to rescind.  And when you

10  rescind, you have to get back to the status quo, put the

11  party at the -- the victim, Your Honor -- Mr. Snyder alluded

12  to us that we go back to the status quo.  It's the victim

13  that goes back to the status quo.  And Wal-Mart is claiming

14  victim status here.

15        To put them back in the status quo would be to

16  return them to where they were before they entered into

17  these things.  They have to return the profit, $900,000,

18  plus whatever it works out to be, and the product that they

19  still have in the warehouse.  That would put them back --

20  actually, what they would have to return is the whole

21  million eight.  We would return to them 923,000, so it's a

22  -- the net effect is they would have to return the profit.

23        THE COURT:  Okay.  As I said, we don't usually

24  have this come up in context where the defrauded person made

25  money off the fraudulently-induced contract.  It usually

1  doesn't work that way.

2       MR. MOORE:  You are right, Your Honor.

3       I would like you to address -- *Fouquette* is, I

4  believe, how it's pronounced.  We cited it in the brief.

5  The case didn't go into great detail in this, but it was a

6  situation where the investor had two investments going on

7  with the same person.

8       THE COURT:  Right, and he wanted to revoke the bad

9  one and keep the good one.

10      Well, this is odd.  Why doesn't Wal-Mart say when

11 -- on January 20th when they get this information, why don't

12 they say you can't go about doing it this way, we're not

13 going to do business with you, we're not going to do

14 business with any of our vendors who source your products

15 and then sell off the rest of it and just send you a check

16 and be done with it?  Why does Wal-Mart, who has made a

17 million bucks off of your company's products, why are they

18 so adamant in wanting to return them and to sort of cut

19 their profits off at one million instead of making another

20 million off the products?

21      MR. MOORE:  I've asked myself that a hundred

22 times, Your Honor.  And the only thing I can come up with,

23 Your Honor, is it's ego.  Mr. Snyder said somehow Webb got

24 around the system.  I don't think it got around the system.

25 But Kim Carter -- and you had to be there for the -- what's

1    the word -- for the non-verbal communication that was going

2    on there, but she seemed to take this extremely personally

3    for some reason.  And that's all I can muster on this, is

4    that there is some sort of ego play going on here because it

5    doesn't make sense to me.

6         THE COURT:  Now, if we ended this lawsuit today

7    and everything just -- now, one thing I can't understand is

8    you talk about this product being worthless.  I don't

9    understand why this product is worthless.

10        Suppose Wal-Mart returns to you the lip balms of

11   the Duluth Denfeld Hunters.  Okay?  And so they are not

12   being sold up in the Duluth Wal-Mart anymore.  So you've got

13   now a case of lip balms with Duluth Denfeld Hunters.

14   There's a hundred stores in Duluth that would sell Duluth

15   Denfeld Hunters.  Why don't you just put them in another

16   store and make money off the returned product?  Why are you

17   letting it sit and rot in the warehouse?

18        MR. MOORE:  I think that's easier said than done,

19   Your Honor.

20        THE COURT:  You sell stuff through, what,

21   Walgreen's, CVS.  Why don't you go up to the Walgreen's

22   store in West Duluth and have them put Duluth Denfeld Hunter

23   lip balms on it?

24        MR. MOORE:  Well, I know that Webb Candy has tried

25   to sell to Walgreen's.  I don't know about Duluth.  I know

1     they have tried to sell product through Walgreen's.

2          THE COURT:  I just don't understand why having a

3     warehouse full of high school branded lip balm and hand

4     sanitizer, which does not have an expiration date worth

5     talking about at least, why there is no chance to mitigate

6     damages there, why there isn't any chance to go out and sell

7     that stuff.  You've got salespeople who got on the phone to

8     Wal-Mart stores.  Why can't those same salespeople go a

9     little further in the phone back and call other stores?

10          MR. MOORE:  I would assume the mom and pop shop in

11     Duluth isn't going to buy 1,000 of these lip balms.

12          THE COURT:  They might buy 500 or 200.  You just

13     don't know.  You know, in a lot of cities like Duluth

14     Wal-Mart isn't the only store in town.

15          Your brief sort of in a footnote sort of says that

16     stuff is all useless to you.  I understand you make the

17     point that to rebrand it would cost more than it's worth.

18     If you are selling these things at 60 cents, I'm sure

19     rebranding would cost more than that.  I don't understand

20     why -- Mr. Snyder, one of the arguments he makes, is you

21     need to mitigate damages.  I think it would be his burden to

22     show at trial that you could have and didn't mitigate

23     damages.  But I'm not sure why the concept isn't correct --

24     that is, Webb has got an obligation here to have its

25     salespersons to try to get other people to sell this stuff

1    and sell it and mitigate its damages.

2              MR. MOORE:  You are right, Your Honor, they do

3    have an obligation.  And the way that -- I guess the way

4    Webb has looked at it is we're going to have to unlabel all

5    of these and then relabel them.

6              THE COURT:  I don't know why -- like I said, if

7    you have got Duluth Denfeld Hunters lip balm, you have

8    probably got a hundred stores that might be interested in

9    selling Duluth Denfeld Hunter lip balm.  Why would you have

10   to repackage them?  It would be an issue to try.  It's one

11   of many things that I don't think I can grant summary

12   judgment on.

13             Let me ask you this.  I started to ask you this.

14   If we stop right now and everybody went home with what they

15   have got, does your client lose -- I don't mean does he lose

16   profits he's expecting, but does he lose any money?  I have

17   got to qualify it in a second way.  I realize he has had

18   money perhaps stolen from him by Little i, but does he lose

19   any money?  Is he out of pocket anything on this?

20             MR. MOORE:  Well, he has shipped the product to

21   Wal-Mart, 63 cents --

22             THE COURT:  Let's say we just stop right now and

23   Wal-Mart keeps or throws away the stuff it has in its

24   warehouse and you resell or throw away the stuff you have in

25   your warehouse.  Mr. Snyder does this calculation in his

brief, which essentially is, you know, they have paid you --

although Little i took some of it, but they paid you 900

some thousand dollars.  Your profit margin also is about 50

percent.  So basically you have already -- you are not out

anything in terms of out-of-pocket costs.

What this lawsuit is for you, as it is for

Wal-Mart, is what additional profit, if any, you are going

to make.  But you have already made some profit on this deal

even if we stop right now.

MR. MOORE:  There has been some profit.

The other thing is Wal-Mart has sold -- and in

their briefs they don't really address this, but there is

$150,000 and some change out there that is not in their

warehouse, and it appears as though that product was sold.

THE COURT:  Yeah, well, they say that that's not

true, that you are double-counting.  The 152,000 was payment

for product that after the pull order is now in the

warehouse.  I had a little trouble following all the numbers

on that.

MR. MOORE:  I can imagine.  They get a little

tricky.  But on that they are not included in the warehouse

because when you do the math on it, the numbers -- if you

take the amount sold and shipped, the amount paid, and

that's the whole amount, the 923,000, subtract out the

amount of returns, that was 380 some odd thousand, then

1     subtract out the 362,000 that's sitting in Wal-Mart's

2     warehouse, there is still $150,000 there.

3            THE COURT: Well, I'm not doing damages today,

4     believe me.

5            Okay. Did you have anything more you wanted to

6     say, Mr. Moore?

7            MR. MOORE: No, I think that pretty much covers

8     the case, Your Honor.

9            THE COURT: Okay.

10            Mr. Snyder, is there anything more you wanted to

11     add?

12            MR. SNYDER: Your Honor, I just want to revisit

13     what seems to be the central issue that, at least from my

14     case, you're concerned about and that is, well, don't they

15     have an agreement with LSM and doesn't that end the whole

16     discussion. And I don't think it does --

17            THE COURT: To be clear, I don't think it ends the

18     discussion. I think you still have a fraud claim. It's

19     just a different fraud claim than the one that at least is

20     featured or prominent in your briefs.

21            Your briefs -- your fraud claim -- the drum you

22     continue to beat is we were misled about who we were dealing

23     with, who we were contracting with. We thought we were

24     entering into a contract with an approved vendor, we

25     weren't. We were entering into a contract with an

1    unapproved vendor.  I don't think that fraud claim works or

2    at least I don't think it works on summary judgment.

3            I think you do have a fraud claim, which has been

4    developed in front of me here today -- again, if you meant

5    this to be in your brief, I just didn't pick it up -- which

6    is not only did we think we were dealing with a vendor, it's

7    not only about the identity of the vendor, we thought we

8    were buying approved product.  We weren't buying approved

9    products.  And that's a different fraud claim.  You can make

10   that claim if you want.  I will let you try that claim.  But

11   that claim hasn't been teed up for me on summary judgment.

12           MR. SNYDER:  Well, the issue that has been teed

13   up, it is the identity issue, and that provides the basis

14   for summary judgment in this case.

15           Your Honor, it's no different than if next year

16   when you are interviewing law clerks someone comes in and

17   says my name is Sarah Jones and I am valedictorian at

18   Harvard, here's my resume and it's not Sarah Jones.  It's

19   somebody else.  You hire that person.  You have a contract

20   with that person.  You don't have a contract with Sarah

21   Jones.  You have a contract with whoever you hired.  And now

22   late into the term you discover --

23           THE COURT:  I'm sorry, I don't follow.  They came

24   to you when Mr. -- I forget the name.  Henson, was he one of

25   the people, the national sales manager?

1          MR. SNYDER:  Yes.

2          THE COURT:  Okay.  Mr. Henson calls the store

3     manager.  He says, I'm with LSM.  I essentially want to

4     convince you to enter a contract with LSM for some of these

5     lip balms.  What comes out of that is a contract with LSM

6     for those lip balms.  So the contract is exactly with who

7     the manager thought the contract was with.  The product is

8     exactly what the manager thought he was getting, except for

9     the possibility of not being approved, but in terms of he is

10    getting lip balm.  I don't understand the fraud in that.

11         MR. SNYDER:  It's not a contract with LSM because

12    LSM does not own this product.  LSM is not making the sales

13    calls.  LSM is not making the offer that's being accepted by

14    the store manager.  That's the contract, the offer of

15    acceptance --

16         THE COURT:  The person making the offer is acting

17    on LSM's behalf, with LSM's knowledge, with LSM profiting in

18    front of it, going out with LSM invoices.  I mean, I don't

19    understand -- if you check the transcript, I think you will

20    find this:  I asked you very early on in this argument did

21    you have a contract with LSM and you said yes, they did have

22    a contract with LSM.

23         MR. SNYDER:  That is what the contract says.  Just

24    like if you hire that clerk, even though the person at

25    Harvard that loaned out her name and her resume to your

1    clerk, you know, you don't have a contract with that person.

2    You have a contract with the person that's sitting in your

3    chambers, right?  That's the same exact thing as the

4    identity.

5            THE COURT:  I think right now today you have

6    contracts, lots of them, with LSM.

7            MR. SNYDER:  That's whose name is on the invoices.

8            THE COURT:  That's who you have a contract with, I

9    believe.  Now, if you want to try it, we will try it.  The

10   jury can decide who you have a contract with.  But when your

11   manager gets called by someone who says I'm with LSM, I want

12   you to make a contract with LSM, an invoice goes out from

13   LSM, the check comes back to LSM, I think you've got a

14   contract with LSM.  To the contrary, I don't think you have

15   a contract with Webb Candy.

16           MR. SNYDER:  We have a contract with someone who

17   is supplying products to us, right.  Put aside the

18   designation.  We have a contract with someone who is

19   supplying that product.  We think it's one entity.  It's

20   actually a different entity.  So we have a contract, but

21   it's a voidable contract.  That's the whole point of the

22   restatement.

23           THE COURT:  No, you have a contract with LSM.  LSM

24   has the legal obligation to supply lip balms to you.  They

25   essentially delegate that without your knowledge to Webb

1    Candy.  But if the lip balm doesn't show up, I think your

2    claim is against LSM, not against Webb Candy.  Webb Candy is

3    a stranger to you.  You've never heard the words "Webb

4    Candy."

5            MR. SNYDER:  Either way it's a voidable contract

6    because the real supplier here is Webb Candy.  I think we

7    can agree to that.  The real supplier here is Webb Candy,

8    the company that we have rejected numerous times.

9            THE COURT:  Well, if the store manager is thinking

10   I'm not just entering a contract with LSM, but LSM is

11   guaranteeing to me that LSM will be making these lip balms,

12   not that they are getting them from someone else, then you

13   are right, you didn't have the contract.  But I didn't see

14   evidence of that in the record.

15            I mean, at the end of the day, your store managers

16   are getting exactly the product they thought they were

17   getting, and their contract was with exactly the person they

18   thought they were contracting with.  I just don't see a

19   fraud claim.  Now, you may have better luck with a juror

20   than me, but I just -- Mr. Snyder, sometimes I am like

21   everybody else, I make mistakes.  Sometimes I just don't see

22   things even that are obvious.  I just really, really have

23   trouble seeing Wal-Mart's problem here.  They got what they

24   thought they were getting.  Their contracts are with whom

25   they thought they were contracting with.  They made a ton of

money off of this.  I don't understand why we're litigating
this.  But I'm going to let you make your case to the jury.
I can't award summary judgment based on my understanding of
the case.  If I've screwed this up, I apologize to you; it
happens.  I just don't see the problem here.

MR. SNYDER:  The whole restatement argument goes
away, that you are contracting with someone you think is a
millionaire.  He is not a millionaire.

THE COURT:  I don't know how many times I can say
it.  You are contracting with exactly who you thought you
were contracting with.  Your manager thought he was entering
a contract with LSM.  You have a contract with LSM.  You
have a contract with LSM.  That is who you thought you were
contracting with.  That's who you are contracting with.

MR. SNYDER:  And it's voidable because the true
supplier is not LSM.

THE COURT:  If part of that contract is not just
that I am contracting with LSM, but LSM has to be personally
supplying that, not essentially getting someone else to
fulfill their obligations for them, then you are right, it's
a breach of contract.  But I don't see that in the record or
the briefs that I've got.  That's just not the way this has
been teed up.  So, you know, I'm sorry, that's the way I see
the case.  All right?  Thank you, Mr. Snyder.

All right.  So for the reasons I've discussed, I

1     can't grant summary judgment on this case to either side. I

2     mean, there's a number of facts that are in dispute here,

3     and we haven't even talked about issues like damages where I

4     can't even follow the arguments of the parties, much less

5     say that there is nothing in dispute. There is an issue of

6     mitigation, which has to be tried.

7          Mr. Snyder and I haven't talked about this, but

8     his argument against Webb Candy's summary judgment motion,

9     for example, that Webb Candy has to show that contracts were

10     formed with -- each of these things was in fact a contract,

11     I agree with. Webb Candy can do that through overall

12     testimony. It doesn't have to have an employee say I

13     remember each of those 100 contracts. But it at least has

14     to have testimony like that from Mr. Webb about what the

15     practice of Webb Candy was, and the jury has to decide

16     whether they believe it. But on both sides there is just a

17     ton of things that have to be tried here.

18          I think this is going to be an extremely difficult

19     case to try. I have no idea how we'd even start to instruct

20     the jury on this. I have no idea how to explain to the jury

21     how this is a fraud claim when Wal-Mart made a million

22     dollars off of being defrauded. But, you know, it's not a

23     jury friendly case for either of you. But you have the

24     right to try this claim if you want to try this claim.

25          So I will deny the summary judgment motions. I

1    will have my calendar clerk get ahold of you.  We will get

2    this on the trial calendar I suspect for July or August

3    probably given where we're running right now.  I will

4    probably have some early deadlines, and we will have to have

5    an early and long pretrial conference because there are a

6    number of issues that are hard to instruct the jury on and

7    how to try just because it's such an unusual case.  But we

8    will cross that bridge when we come to it.

9                Thank you for your help with the case.  I will

10   have my calendar clerk get in touch with you today or

11   tomorrow, and we will get the thing set up for trial.  Okay?

12              THE CLERK:  All rise.

13              (Court adjourned at 11:30 a.m.)

14                          *      *      *

15

16          I, Debra Beauvais, certify that the foregoing is a

17   correct transcript from the record of proceedings in the

18   above-entitled matter.

19

20              Certified by:   s/Debra Beauvais
                                Debra Beauvais, RPR-CRR
21

22

23

24

25